**Ricky D. SCOTT, Plaintiff,**

v.

**LEE COUNTY YOUTH DEVELOP-MENT CENTER, Defendant.**

**No. CIV.A.01–A–1472–E.**

United States District Court, M.D. Alabama, Eastern Division.

Nov. 14, 2002.

Frank W. Riggs, Joseph E. Burkhart, Montgomery, AL, for Plaintiff.

Albert L. Vreeland, Michael L. Thompson, Birmingham, AL, for Defendant.

ALBRITTON, Chief Judge.

*MEMORANDUM OPINION*

**I.   *INTRODUCTION***

This cause is before the court on a Motion for Summary Judgment filed by the Defendant, Lee County Youth Develop-

ment Center, on September 20, 2002 (Doc. # 16).

The Plaintiff, Ricky D. Scott, filed a Complaint on December 13, 2002, bringing claims for retaliation under Title VII, 42 U.S.C. § 2000e–3(a), and defamation under Alabama state law (Doc. # 1). On January 9, 2002, the Defendant filed an Answer in this case (Doc. # 4). The Defendant subsequently filed a Motion for Summary Judgment on September 20, 2002.

For the reasons to be discussed, the Defendant's Motion for Summary Judgment is due to be GRANTED as to the Title VII claim and the state law claim is due to be DISMISSED without prejudice.

## II. SUMMARY JUDGMENT STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323, 106 S.Ct. 2548. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing, or pointing out to, the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322–24, 106 S.Ct. 2548.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. 2548. To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). On the other hand, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in its favor. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

## III. *FACTS*

The submissions of the parties establish the following facts, construed in a light most favorable to the nonmovant:

The Defendant is a not-for-profit organization that provides residential treatment and outreach services to children and families throughout east-central Alabama. The Plaintiff is an African–American male who began full-time employment with the Defendant as a Residential Specialist in September 1997. The Plaintiff was promoted to Assistant Coordinator II of the Residential Treatment Program in September 2000. As an Assistant Coordinator, the Plaintiff's duties included providing direct care to resident children, supervising the

Resident Specialists, and hiring new employees for the Residential Treatment Program. During the course of his employment with the Defendant, the Plaintiff also maintained a second full-time position with the Alabama Department of Youth Services.

At the same time that the Plaintiff assumed his Assistant Coordinator position with the Defendant, Ellen Ingram, an African–American female, took over as the Coordinator of the Residential Treatment Program and became the Plaintiff's direct supervisor. After Ingram assumed this position, the Plaintiff contends that the Defendant began to discriminate against Caucasian employees.

Due to the interracial makeup of the children in the residential program, the Plaintiff believed that the Defendant needed both Caucasian and African–American employees to provide stability and emotional guidance to the children. The Plaintiff saw a need for Caucasian personnel because he believed that young Caucasians would benefit from interacting with treatment personnel of their own race, just like young African–Americans would benefit from working with African–American treatment personnel. According to the Plaintiff, Ingram did not believe in this philosophy and began to discriminate against various Caucasian applicants and employees on the basis of their race. After voicing objections to this practice, the Plaintiff believes that the Defendant began to retaliate against him.

As evidence of the Defendant's retaliation, the Plaintiff points to several adverse employment actions during the fall of 2000. First, the Plaintiff suffered a demotion in job duties as he was no longer permitted to interview job applicants. Second, he was not given a pay raise even though he was promoted to a higher pay grade. Third, the Plaintiff was not permitted to speak with Dr. Bridget Smith, the clinical psychologist of the treatment program, after he stated his opposition to the Defendant's discrimination. Fourth, Ingram gave the Plaintiff lower job ratings that were not representative of the Plaintiff's work performance. Fifth, the Plaintiff contends that Ingram made several derogatory remarks about him, calling him an "Uncle Tom," lazy, and stupid.

On December 11, 2000, the Defendant gave the Plaintiff written notice that he would not be permitted to work for the Alabama Department of Youth Services and still maintain his employment with the Defendant. In short, the Plaintiff could no longer work two jobs. An excerpt of this notice stated the following:

> Effective January 1, 2001, you are prohibited from conducting or completing other employment outside the agency. This step is necessary so that your efforts and energies may be completely engaged while you are fulfilling your employment duties.

*See* Scott Depo., Exhibit # 20. Although this notice did not explicitly state that the Plaintiff's employment would be terminated if he continued to work two jobs, the Plaintiff understood that he could either work one job or the other, but "not both." *See* Scott Depo. pp. 255–56. The Plaintiff argues that the imposition of the two-job policy constituted a constructive discharge in retaliation for his objections to the Defendant's racial discrimination and points to the fact that other employees were not given a similar mandate. The Defendant contends that it applied this policy to all employees holding a second full time position. Moreover, the Defendant argues that this policy was specifically necessary in the Plaintiff's case because his second job was adversely impacting his work performance.

On December 21, 2000, the Plaintiff met with Ingram to discuss his employment

future with the Defendant. At the time of this meeting, the Plaintiff and Ingram "had already decided that [the Plaintiff] was going to be moving on." *See* Scott Depo. p. 260. On December 29, 2000, the Plaintiff tendered the following letter of resignation:

> I would like to terminate my position as Assistant Coordinator II of Treatment. Please accept this as my official two week notice as of 12–29–00.

*See* Scott Depo., Exhibit # 21. The Plaintiff's final day of employment with the Defendant was January 12, 2001.

On July 11, 2001, the Plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC") alleging a hostile work environment and opposition-based retaliation. The EEOC responded to this complaint by stating that it could not take any action on the case because all of the Defendant's alleged unlawful actions took place outside the 180–day filing deadline.

## IV.  DISCUSSION

The Plaintiff alleges three causes of action in his Complaint. First, the plaintiff alleges that he is the victim of opposition-based retaliation in violation of Title VII because the Defendant took adverse employment action against him for opposing the discrimination of Caucasian employees. Second, the Plaintiff argues that the Defendant created a hostile work environment in violation of Title VII.[1] Third, the Plaintiff brings a claim under Alabama state law for defamation.

Because the Plaintiff failed to file his initial charge with the EEOC within the prescribed 180–day period, the Defendants' Motion for Summary Judgement is due to be GRANTED as to his Title VII claims.

### A.  Timely Filing of EEOC Charge

▮  Title 42 U.S.C. § 2000e-5(e)(1) specifies the prerequisites that a plaintiff must satisfy before filing a private civil action under Title VII. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 S.Ct. 2061, 2070, 153 L.Ed.2d 106 (2002). According to this provision, "[a] charge . . . shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1). If a plaintiff fails to file an EEOC charge before the 180–day limitations period, the plaintiff's subsequent lawsuit is time barred and must be dismissed for failure to exhaust administrative remedies. *Brewer v. Alabama*, 111 F.Supp.2d 1197, 1204 (M.D.Ala.2000).

---

1. The court understands the Plaintiff's Complaint to allege both a traditional retaliation claim and a hostile work environment claim. The primary thrust of the Plaintiff's Complaint is that the Defendant retaliated against the Plaintiff by creating a hostile work environment and by engaging in discrete adverse employment actions, such as lower job performance ratings and constructive discharge. Although the Plaintiff has focused his argument on the discrete acts of retaliation, the court acknowledges that Title VII recognizes a separate and distinct cause of action for a "hostile work environment." *See Rojas v. Florida*, 285 F.3d 1339, 1344 (11th Cir.2002). Because of the different analytical approach to these two claims and the fact that the Plaintiff consistently alleges both a hostile work environment and discrete acts of retaliation, the court will consider these two claims separately. *Compare Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (holding that in order to establish a hostile work environment the plaintiff must prove that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment") (internal citations and quotations omitted), *with Rojas*, 285 F.3d at 1342 (analyzing a claim of opposition-based retaliation under the *McDonnell Douglas* framework).

The Supreme Court has noted that "strict adherence" to this procedural requirement "is the best guarantee of even-handed administration of the law." *Mohasco Corp. v. Silver*, 447 U.S. 807, 826, 100 S.Ct. 2486, 65 L.Ed.2d 532 (1980). By choosing what is an obviously short deadline, "Congress clearly intended to encourage the prompt processing of all charges of employment discrimination." *Id.* Indeed, this procedural rule is not a mere technicality, but an integral part of Congress' statutory scheme that should not "be disregarded by courts out of a vague sympathy for particular litigants." *Baldwin County Welcome Ctr. v. Brown*, 466 U.S. 147, 152, 104 S.Ct. 1723, 80 L.Ed.2d 196 (1984).

In the present case, the Plaintiff filed his EEOC charge on July 11, 2001. Therefore, the charge is timely only if the unlawful employment action against the Plaintiff "occurred" on or after January 12, 2000. *Morgan*, 122 S.Ct. at 2070 (stating that a party must file an EEOC charge within 180 days from the date the unlawful act occurred or lose the ability to recover for it).

Of the six unlawful employment actions alleged by the Plaintiff, five clearly fall outside the 180–day period between January 12, 2000 and July 11, 2001. More specifically, the Plaintiff admits that five acts of retaliation took place during the fall of 2000: 1) a reduction in job duties; 2) the lack of a raise; 3) the order not to speak with Dr. Smith; 4) the lower job performance ratings; and 5) the slanderous remarks by Ingram. Because the Plaintiff did not file his EEOC charge "within one hundred and eighty days after the[se] alleged unlawful employment practice[s] occurred," the Plaintiff cannot maintain an action under Title VII to seek redress for these actions. 42 U.S.C. § 2000e-5(e)(1).

As a result of this conclusion, the only alleged act of retaliation that could possibly fall within the 180–day window is the Plaintiff's constructive discharge. Nevertheless, this claim is only actionable if the court determines that the Defendant constructively discharged the Plaintiff on his final day of work, January 12, 2001—the 180th day. If the discharge occurred before this date, the Plaintiff cannot maintain either of his Title VII claims as none of the actions that the Plaintiff complains of would be within the required EEOC filing period. Therefore, the court must determine whether the Defendant constructively discharged the Plaintiff on January 12, 2001, or at some point prior to this date.

The Plaintiff argues that the Defendant never gave him unequivocal notice of his termination until January 12, 2001, his final day of employment. In support of this position, the Plaintiff contends that the Defendant had ample opportunity to recant its discriminatory application of the two-job policy at any point prior to the Plaintiff's final day. Because the Defendant refused to reverse its position on January 12, 2001, the Plaintiff argues that this failure to act was the final "act" of retaliation and the Plaintiff did not have notice of this "act" until his last day of employment.

The Defendant contends that the Plaintiff had notice of his termination on any one of three dates prior to January 12, 2001: 1) December 11, 2000—the date the Defendant gave the Plaintiff the written memo stating that he was prohibited from working a second job effective January 1, 2001; 2) December 21, 2000—the date the Plaintiff met with Ingram and decided that he would be "moving on"; 3) December 29, 2000—the date the Plaintiff formally tendered his resignation.

The issue of when a claim for constructive discharge begins to accrue for pur-

poses of the EEOC's 180–day filing deadline is one of first impression for the Eleventh Circuit. In traditional discriminatory discharge cases, the unlawful employment action is usually the decision to terminate the employee, and the 180–day limitations period begins to run on the date that the employer gives definite notice of that decision to the employee. *See Delaware State College v. Ricks*, 449 U.S. 250, 258, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980). In this type of direct discharge case the time for filing a claim with the EEOC starts to run on the date when the employee receives "unequivocal notice" of the adverse employment decision.[2] *Grayson v. K Mart Corp.*, 79 F.3d 1086, 1100 n. 19 (11th Cir.1996); *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 849 (11th Cir.2000) (stating that "the 180–day charge filing period does not run until the plaintiff is told that she is actually being terminated").

Unlike traditional discharge cases, constructive discharge of an employee occurs when an employer, rather than directly discharging an individual, "deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation." *Doe v. Dekalb Co. Sch. Dist.*, 145 F.3d 1441, 1450 (11th Cir.1998). In such cases, the employee has simply had enough and opts to quit his employment rather than continue working under the employer's conditions. *See Draper v. Coeur Rochester, Inc.*, 147 F.3d 1104, 1110 (9th Cir.1998). Although the date of the employee's resignation may be easily ascertainable, the actual timing of when the constructive discharge "occurs" for purposes of the 180–day filing deadline is complicated frequently by the reality that employees rarely sever all ties with their employer on the date they tender their resignation. For example, employees usually work for an additional period of time after giving their notice of resignation and often remain on either the employer's payroll or benefit plan for a period of time following their final day of work. *See, e.g., Krzyzewski v. Metro. Gov't of Nashville*, 584 F.2d 802, 804 (6th Cir.1978) (stating that an employee was terminated on August 15, but was paid for accrued

**2.** This rule was first discussed by the Supreme Court in *Delaware State College v. Ricks*, 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980). In *Ricks*, the Court considered the timeliness of an EEOC complaint filed by a college professor who argued that a college denied him academic tenure because of his national origin. Following the decision to deny tenure, the college offered the professor a contract to teach one additional year. *Id.* at 253–54, 101 S.Ct. 498. The Court rejected the professor's argument that the EEOC filing period did not begin to run until after the expiration of his one year contract According to the Court, "[m]ere continuity of employment, without more, is insufficient to prolong the life of a cause of action for employment discrimination." *Id.* at 257, 101 S.Ct. 498. The only alleged act of discrimination by the college was the denial of tenure, thus the statute began to run on the date this decision was communicated to the professor, even though the effects of this denial—the loss of the teaching position—did not occur until after the expiration of the contract. *Id.* at 258, 101 S.Ct. 498. Put simply, "[t]he proper focus is upon the time of the discriminatory acts, not upon the time at which the consequences of the acts become most painful." *Id.* (citing *Abramson v. University of Hawaii*, 594 F.2d 202, 209 (9th Cir.1979)).

Although both parties in this case have focused their arguments around *Ricks* and its progeny, the court does not view it as the controlling authority in this action. As explained above, *Ricks* addressed a situation in which an employee was discharged directly from employment through a clear command by an employer. In contrast, this case involves a constructive discharge in which the employee alleges that he was forced to leave his employer due to hostile and retaliatory conditions. As a result of this difference, this case is better governed by the rules announced in constructive discharge cases rather than direct discharge cases. *See infra* pp. 1294 – 1295.

time until August 29); *Brewer,* 111 F.Supp.2d at 1201 (stating that the plaintiff tendered her resignation on August 30, 1996, but designated her last day of work as September 20, 1996). The present action fits this category of cases as the Plaintiff tendered his resignation on December 29, 2000, but continued to work for two additional weeks until January 12, 2001. Due to these two possible termination dates, the court must decide whether the 180–day filing period began to run on the day the Plaintiff gave notice of his resignation or the final day of the Plaintiff's employment.

Although the Eleventh Circuit has not addressed this issue, the uniform rule announced by other courts presented with similar constructive discharges cases is that the EEOC's 180–day filing period is measured from the date the employee gives notice of his intent to resign, not his last day of employment. *See Flaherty v. Metromail Corp.,* 235 F.3d 133, 138 (2d Cir.2000) (holding that the plaintiff's claim accrued on "the date when she gave definite notice of her intention to retire, and the rule should be the same in all cases of constructive discharge"); *Draper,* 147 F.3d at 1110 ("We hold ... that in constructive discharge cases periods of limitation begin to run on the date of the resignation."); *Gerhart v. Boyertown Area Sch. Dist.,* 00–CV–5914, 2002 U.S. Dist. LEXIS 11935, at *15 n. 9 (E.D.Pa. March 4, 2002) (adopting *Flaherty* and holding that the statutory period began to run for a constructive discharge claim on the date the plaintiff announced her retirement, not the date her retirement became effective); *Nichols v. American Nat'l Ins. Co.,* 945 F.Supp. 1235, 1239 (E.D.Mo.1996) ("This Court therefore holds that the proper accrual date is the date on which Plaintiff communicated her intent to resign, rather than the date of her actual resignation."); *Adames v. Mitsubishi Bank, Ltd.,* 751 F.Supp. 1565, 1570 (E.D.N.Y.1990) ("[T]he

relevant time period is measured from the date the employee gave notice of her intent to resign and not her last day on the job."); *Lowell v. Glidden–Durkee Div. of SCM Corp.,* 529 F.Supp. 17, 18–20 (N.D.Ill. 1981) (holding that the 180–day period began to run on the date the plaintiff advised her supervisor of her resignation, not the date that her resignation became effective.). This rule is largely based upon the fact that in a constructive discharge case only the employee can know when the atmosphere has been made so intolerable that he must leave. *Flaherty,* 235 F.3d at 138. In this respect, the court agrees with the reasoning of the Ninth Circuit Court of Appeals:

> We hold ... that the date of discharge triggers the limitations period in a constructive discharge case, just as in all other cases of wrongful discharge. Constructive discharge is, indeed, just one form of wrongful discharge. The fact that the actual act of terminating employment is initiated by the employee, who concludes that she is compelled to leave as a result of the employer's actions, rather than by the employer directly does not change the fact that the employee has been discharged.

*Draper,* 147 F.3d at 1110. This reasoning, along with the uniform position of the other federal courts that have addressed this issue, persuades the court to adopt the rule that the EEOC filing deadline begins to run in a constructive discharge case on the date the employee communicates his resignation, not on the employee's final day of work.

■ Although the Plaintiff received notice of the Defendant's two-job prohibition on December 11, 2000, and gave Ingram some indication of his intent to leave the Defendant's employ during their meeting on December 21, 2000, the Plaintiff officially resigned his position on December 29,

2000 when he tendered his written letter of resignation.[3] The 180–day EEOC filing limitation began to run on that day. Because the Plaintiff did not file his EEOC charge until July 11, 2001—195 days after he submitted his resignation—the Plaintiff cannot maintain his claim for constructive discharge.

This conclusion is bolstered by the Eastern District of Missouri's reasoning in *Nichols v. American National Insurance Co.*, 945 F.Supp. 1235 (E.D.Mo.1996). On January 15, 1993, plaintiff Nichols communicated her intention to resign on January 25, 1993. *Id.* at 1238–39. Like the present case, Nichols continued to work for a period of two weeks after her formal notice of resignation. As a result of this arrangement, the *Nichols* court was presented with the exact same issue that this court faces: whether the EEOC filing period began to run on the date the plaintiff gave her notice of resignation or the date of her actual resignation. The *Nichols* court also adopted the rule that the EEOC filing period begins on the date the employee communicates her intent to resign. *Id.* at 1239. Therefore, the *Nichols* court concluded that Nichols' EEOC charge was filed four days late as measured from the date Nichols tendered her resignation. *Id.* Similarly, the Plaintiff's complaint in this case is fifteen days late as measured from December 29, 2000, the date the Plaintiff formally gave notice of his resignation.

Because the Plaintiff attempts to invoke the continuing violation doctrine in bringing his retaliation and hostile work environment claims, the Supreme Court's decision in *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002), is important to the disposition of this case. In *Morgan*, the Supreme Court recently "eschewed the use of the continuing violation doctrine in hostile work environment cases." *Shields v. Fort James Corp.*, 305 F.3d 1280, 1281 (11th Cir.2002). In doing so, the Court drew a specific distinction between discrete acts of discrimination and hostile environment claims. With the respect to the former, the Court stated that "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable unlawful employment practice." *Morgan*, —— U.S. at ——, 122 S.Ct. at 2073. According to the Court, "each discriminatory act starts a new clock for filing charges alleging that act." *Id.* at 2072. Therefore, a plaintiff must file an EEOC charge within 180 days after the discrete act occurred; acts falling outside of this limitations period will be barred, "even if they are related to acts alleged in timely filed charges." *Id.*

In contrast to discrete acts of retaliation, the Court held that hostile work environment claims are made up of a series of separate acts that "collectively constitute one 'unlawful employment practice.'" *Id.* at 2074 (quoting 42 U.S.C. § 2000e–5(e)(1)). As a result of this singular formulation, "[i]t does not matter ... that some of the component acts ... fall outside the statutory period" as long as "an act contributing to the claim occurs within the filing period." *Id.* .

Under *Morgan*, the Plaintiff cannot maintain either of his Title VII claims because he has not established that the Defendant took unlawful employment action against him on or after January 12, 2001. The Plaintiff argues that his EEOC charge was timely because his constructive

---

**3.** Although the parties have differing views on the impact of the December 11 memo and the meeting between the Plaintiff and Ingram on December 21, neither party disputes the fact that the Plaintiff tendered his resignation on December 29, 2000.

discharge did not occur until his final day of work. The Plaintiff also contends that this discharge was a component act of his hostile environment claim, thus the Plaintiff concludes that this claim was timely under *Morgan* because at least one unlawful act—the constructive discharge—took place within 180–day period. Although the Plaintiff's argument flows logically from *Morgan*, the foundation of this argument has been destroyed by the court's holding that the constructive discharge took place on date of the Plaintiff's resignation, not on his final day of work. With this conclusion in place, the Plaintiff cannot maintain an action for hostile work environment because none of the component acts complained of took place within the 180–day filing period. Furthermore, the retaliation claim for the discrete act of constructive discharge cannot move forward as the Plaintiff's discharge also occurred outside of the 180–day filing window.[4]

In summary, each of the alleged unlawful employment actions that the Plaintiff complains of occurred outside of the 180–day filing period.[5] The Plaintiff's EEOC complaint is timely only if the Defendant took unlawful employment action against him on or after January 12, 2001. The Plaintiff has failed to establish that the Defendant took such action as the most recent act of alleged retaliation—the constructive discharge—occurred on December 29, 2000 when the Plaintiff communicated his notice of resignation, not on the Plaintiff's final day of employment. Because all of the Defendant's alleged unlawful employment practices occurred prior January 12, 2001, the Plaintiff's EEOC complaint was not timely. Accordingly, the Plaintiff's claims under Title VII for retaliation and hostile work environment cannot proceed due to a failure to exhaust administrative remedies.

### B. *State Law Defamation Claim*

The remaining claim against the Defendant is a state law claim for defamation. This claim is best handled by the state courts. Under 28 U.S.C. § 1367(c)(3), this court may decline to exercise jurisdiction over state law claims when it has dismissed all claims over which it has original jurisdiction. Having dismissed both of the Plaintiff's Title VII claims, the court chooses to decline the exercise of supplemental jurisdiction over the remaining defamation claim.

### V. *CONCLUSION*

For the reasons stated above, the Defendants' Motion for Summary Judgment is due to be GRANTED as to the retaliation and hostile work environment claims (Count I) against the Defendant. The remaining state law claim for defamation (Count II) is due to be dismissed without prejudice. A separate Order will be entered in accordance with this Memorandum Opinion.

### *ORDER*

In accordance with the Memorandum Opinion entered on this date, it is hereby ORDERED as follows:

1. The Motion for Summary Judgment (Doc. # 16) filed by Defendant Lee County Youth Development Center is GRANTED with respect to Count I of the Complaint. Judgment on this Count is entered in favor of the Defendants and against the Plaintiff, Ricky D. Scott.

---

4. As discussed earlier, all of the other alleged unlawful employment actions are clearly outside the 180–day period because they occurred in the fall of 2000. *See supra* p. 1293.

5. For purposes of addressing the timing issue, the court has assumed that all of the Defendant's alleged retaliatory acts would constitute "unlawful employment actions" under Title VII.

2. Count II of the Complaint is dismissed without prejudice.

3. Costs are taxed against the Plaintiff.