Mary **FLAHERTY**, Plaintiff–Appellant,

v.

**METROMAIL CORPORATION**, Experian Corporation, Experian Information Solutions, Inc. and Experian Holdings, Inc., as successors in interest to Metromail Corporation, Defendants–Appellees.

Docket No. 00–7467.

United States Court of Appeals, Second Circuit.

Argued Oct. 25, 2000.

Decided Dec. 19, 2000.

Janet C. Neschis, McLaughlin & Stern, New York, NY, (Steven J. Hyman and Deanna R. Waldron, on the brief), for plaintiff-appellant.

Robert N. Holtzman, Kramer, Levin, Naftalis & Frankel, LLP, New York, NY, (Kevin B. Leblang and Stephen M. Knecht, of counsel), for defendants-appellees.

Before MINER and SACK, Circuit Judges, and RAGGI, District Judge.*

MINER, Circuit Judge:

Plaintiff-appellant Mary Flaherty appeals from a summary judgment entered in favor of defendant-appellee Metromail Corporation ("Metromail"), and its alleged successors in interest, defendants-appellees Experian Corporation, Experian Information Solutions, Inc., and Experian Holdings, Inc. (collectively "Experian"), in the United States District Court for the Southern District of New York (Buchwald, J.). The action giving rise to this appeal was instituted by Flaherty to recover dam-

* The Honorable Reena Raggi, of the United States District Court for the Eastern District of New York, sitting by designation.

ages arising from her constructive discharge from employment as a consequence of gender and age discrimination and was dismissed by the district court as time-barred. The district court identified the date of accrual of Flaherty's claim as the point in time when Flaherty was given definite notice of her impending termination. The district court concluded that this point was reached, at the latest, on the date Flaherty received a warning letter following a series of allegedly discriminatory acts on the part of supervisory personnel at Metromail.

## BACKGROUND

Metromail is a direct marketing company that sells lists of names to customers (list services), creates master lists for customers with deletion of duplicate names (list enhancement or merge/purge services), and performs mailing services for its customers (lettershop services). Flaherty, a 61 year-old female, began working for Metromail Corporation in 1977 as secretary to Joseph Dikdan. In 1982, Flaherty was made an account manager and full-time sales person in Metromail's East Coast Sales Office.

During Flaherty's tenure at Metromail, she reported to a series of supervisors: (1) Dikdan from 1977, when she was hired, until roughly 1990; (2) Rick Lane from 1990, until his departure in 1993; (3) Mac Rodgers from 1993 through 1995; (4) Beth Hurwitz from 1995 through the middle of 1996, when Hurwitz was transferred; (5) Sam Cardonsky from mid–1996 until February 1997; and (6) James Kaiser from February 1997, until plaintiff's resignation, effective November 1997. Her supervisors, including Lane, Rodgers, Hurwitz, and Cardonsky, reported to Senior Vice–President Mike Reynolds, who was appointed to that position in 1995. Allegedly, Reynolds commenced a campaign to terminate Flaherty's employment.

Flaherty claims she first experienced gender and age discrimination at Metromail in 1993 when her supervisor, then Lane, allegedly expressed his sexist and ageist views to her. According to Flaherty, Lane repeatedly told her that: (1) women did not belong in the workplace; (2) women should be "barefoot and pregnant"; and (3) he would never play golf with a woman. He consistently asked Flaherty, then age 55, when she would retire and suggested that she did not need to work because her husband could support her. Thereafter, Lane caused several of Flaherty's largest accounts to be transferred to male account managers. In 1993, Lane was replaced by Rodgers, who was then succeeded by Hurwitz in 1995.

Flaherty alleges that discrimination at Metromail continued after Lane left the company. Sometime in 1995, Senior Vice–President Reynolds supposedly told Hurwitz, Flaherty's supervisor at the time, that Flaherty was "too old and grandmotherly" and embarked on a campaign to have her terminated. Flaherty contends that Hurwitz refused to carry out his orders, however, and was transferred to another division as a result.

In March 1996, Cardonsky succeeded Hurwitz and was given the same directive to terminate Flaherty's employment. At that point, Cardonsky allegedly refused to provide Flaherty with the same level of supervisory support that he gave to similarly situated, male account managers. For example, he supposedly refused to meet with Flaherty's customers, which had an adverse impact on her ability to generate business, but regularly met with the customers of other managers.

At a meeting on August 21, 1996 to discuss her performance, Cardonsky issued Flaherty a warning letter which stated that she would be terminated if she did not meet certain budgetary projections by year's end. In pertinent part, the letter stated:

> The expectation is that you will meet, at a minimum, your total revenue budget for 1996. Failure to perform at this

level by year-end could be grounds for separation.

Cardonsky was accompanied at the meeting by a representative of Metromail's Human Resources Department, who allegedly pressured Flaherty to accept a demotion to a lower-paying position in the Catalogue Division, but she refused. Finally, Flaherty says that she found out that on that same day Cardonsky had said to other account managers, "as soon as I can get rid of the old bag, you can have her accounts." Simultaneously, many of Flaherty's key accounts were allegedly offered to Eric Findeissen, a male account executive under the age of 40, but he refused to accept them. Flaherty alleges that she became ill and fainted shortly after learning of these events.

By early 1997, Reynolds and Cardonsky were no longer employed by Metromail. After they departed, Flaherty believed that the warning letter had been withdrawn and that "everything had gone back to normal." James Kaiser replaced Cardonsky. In February 1997, Kaiser failed to reassign a lucrative account to Flaherty and instead assigned it to a younger woman, Elyssa London. For 90 days after his appointment, Kaiser had imposed upon himself a "moratorium" during which time he would not meet with customers. Flaherty contends that, although Kaiser refused to meet with her customers during the moratorium, he did meet with customers of her male peers during the same 90 day period. Flaherty also contends that in May 1997, Kaiser failed to cancel a scheduled meeting with her and simply did not show up. Throughout this period of time, Flaherty continued to experience stress-related symptoms, both physical and emotional, allegedly the result of the discrimination. On May 15, 1997, Flaherty told Kaiser that she was thinking about retirement and asked him to look into a retire-

ment "package," including health benefits. By memorandum to Kaiser dated June 12, 1997, Flaherty submitted her formal retirement, effective November 1st of that year. The memorandum recited her understanding that the notice "meets and exceeds the 90 day notice requirement" specified by company policy. After June 12, Flaherty continued to perform services for Metromail on an almost daily basis, but with a reduction in her scheduled hours, until the effective date of her retirement.

On February 9, 1998, Flaherty filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), claiming she was constructively discharged from Metromail. Having received notice from the EEOC of her "right to sue" on September 8, 1998, Flaherty filed her original complaint, commencing this action, on December 4, 1998. In her amended complaint, Flaherty sought compensatory and punitive damages and attorneys' fees against Metromail and Experian, asserting claims of gender and age discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq., the New York State Human Rights Law, N.Y. Exec. Law § 296, and the New York City Human Rights Law, N.Y.C. Admin. Code § 8–107 et seq. Following the service of an amended answer, defendants moved for summary judgment on the grounds that Flaherty's claims were time-barred, that there was no basis for any claim that any alleged adverse employment action was based on age or gender, and that Flaherty failed to meet the standards for constructive discharge.

The district court granted summary judgment for defendants on the ground that Flaherty's cause of action was barred for failure to timely file administrative charges with the EEOC.[1] The court deter-

---

1. To sustain a claim for unlawful discrimination under Title VII and/or the ADEA, a plaintiff must file administrative charges with the EEOC within 300 days of the alleged discrim-

inatory acts. See 42 U.S.C. § 2000e-5(e)(1); 29 U.S.C. § 626(d)(2). Since Flaherty filed her charges of discrimination with the EEOC on February 9, 1998, her cause of action

mined that Flaherty's cause of action accrued no later than August 21, 1996, the date "when she received 'definite notice' of her looming termination." *Flaherty v. Metromail,* No. 98 Civ. 8611, 2000 WL 288356, at *4 (S.D.N.Y. Mar. 16, 2000). By the time the warning notice was delivered on that date, according to the district court,

> it was clear to her (1) that Cardonsky, her supervisor, would not meet with her clients; (2) that she would be terminated if she did not meet certain projections; (3) that as a practical matter, she could not meet those projections because accounts were transferred away from her; and (4) that she was already being pressured to resign as account manager and accept a lower-paying position in the Catalogue Division.

*Id.* The district court rejected Flaherty's attempt to invoke the "continuing violation exception" to the time-bar and found it unnecessary to determine whether the Experian defendants were liable to Flaherty as successors in interest. *Id.* at *5. This appeal followed the entry of summary judgment for all defendants.

## DISCUSSION

█ The issue of when a claim for constructive discharge occasioned by unlawful discrimination in employment accrues is one of first impression in this circuit, although in an earlier case we noted that the parties had *agreed* "that the limitations period in a constructive discharge case accrues upon the date that the employee gives notice of resignation." *Peterson v. Insurance Co. of North America,* 40 F.3d 26, 29 (2d Cir.1994). It has long been settled that a claim of employment discrimination accrues for statute of limitations purposes on the date the employee learns of the employer's discriminatory conduct. *See Delaware State College v. Ricks,* 449 U.S. 250, 258, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980) ("[T]he filing limitations period ... commenced ... at the

time the tenure decision was made and communicated to [the defendant].''); *Cornwell v. Robinson,* 23 F.3d 694, 703 (2d Cir.1994) (employment discrimination claims accrue on the date that the employee "knows or has reason to know of the injury which is the basis of his action").

In *Ricks,* a college professor claimed that he was denied academic tenure on account of his national origin. *See id.* at 254, 101 S.Ct. 498. Although he contended that his claim accrued at the time of his actual termination of employment a year after tenure was denied, the Supreme Court held that the denial of tenure, the discriminatory act complained of, was the date the claim accrued. *See id.* at 258, 101 S.Ct. 498. Termination was the inevitable consequence of the denial of tenure and "the limitations period commenced to run when the tenure decision was made and [the professor] was notified." *Id.* at 259, 101 S.Ct. 498. The Court cited with approval the holding in a Ninth Circuit tenure case that " '[t]he proper focus is upon the time of the discriminatory acts, not upon the time that the consequences of the acts became most painful.' " *Id.* (quoting *Abramson v. University of Hawaii,* 594 F.2d 202, 209 (9th Cir.1979)).

█ In discriminatory discharge cases, then, the illegal act is often the decision to terminate the employee, and the limitations period begins to run on the date that the employer gives definite notice of that decision to the employee. *See Ricks,* 449 U.S. at 258, 101 S.Ct. 498; *Chardon v. Fernandez,* 454 U.S. 6, 8, 102 S.Ct. 28, 70 L.Ed.2d 6 (1981). Thus, the time for filing a claim with the EEOC "starts running on the date when the employee receives a definite notice of the termination, not upon his discharge." *Miller v. International Tel. & Tel. Corp.,* 755 F.2d 20, 23 (2d Cir.1985). Although allegations of unlawful discrimination by employers underlie claims of discriminatory discharge, as well as claims of constructive discharge where

would be time-barred if it accrued at any time prior to April 15, 1997.

an employer gives no notice of termination, the date of accrual of the former must be different from the date of accrual of the latter.

■ In constructive discharge cases the actionable conduct is not a discrete, identifiable act on the part of the defendant. Rather, "[c]onstructive discharge of an employee occurs when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily." *Chertkova v. Connecticut Gen. Life Ins. Co.,* 92 F.3d 81, 89 (2d Cir.1996); *see also Pena v. Brattleboro Retreat,* 702 F.2d 322, 325 (2d Cir.1983). A court must find a constructive discharge where the employee resigns because an employer causes to exist conditions of such an unpleasant or difficult nature that any reasonable person in the employee's place would do the same. *See Kirsch v. Fleet Street, Ltd.,* 148 F.3d 149, 161 (2d Cir. 1998). We are mindful that "[a] resignation is not itself a 'discriminatory act' if it is merely the consequence of past discrimination, but if the employer discriminates against an employee and purposely makes the employee's job conditions so intolerable that a reasonable person would feel forced to resign, then the resignation is a constructive discharge—a distinct discriminatory act for which there is a distinct cause of action." *Young v. National Ctr. for Health Servs. Research,* 828 F.2d 235, 237–38 (4th Cir.1987) (internal quotation marks omitted).

Flaherty contends that the intolerable atmosphere that caused her to quit consisted of a series of acts by various of her supervisors that made her work atmosphere intolerable. These included failure to assist her with her accounts, threatening her with termination for failure to meet her budget projections, transferring her accounts to others, and pressuring her to take a lower-paying position. These acts allegedly were motivated by age and sex discrimination, as illustrated by some ageist and sexist remarks purportedly made by Flaherty's supervisors.

The district court determined that Flaherty's cause of action accrued when she had definite notice of her "looming termination." Although that is an especially difficult date to ascertain in this case, the district court did identify the date that Flaherty received the warning letter dated August 21, 1996, as "the latest" date when she had notice of her "looming termination." However, an examination of the letter reveals no definite notice of termination. The letter, handed to Flaherty by Cardonsky, merely refers to the company's "expectation" that Flaherty would "meet, at a minimum, [her] total revenue budget for 1996." Failure to perform, according to the letter, "*could* be grounds for separation." (Emphasis added.) Cardonsky himself was later fired, the letter was never mentioned again, and Flaherty herself was under the impression that the warning had been withdrawn. Flaherty asserts that a number of acts that occurred *after* the letter added to the intolerable atmosphere that had been building for some time and that culminated in the submission of her formal notice of retirement on June 12, 1997.

■ We think that the date that Flaherty's claim accrued was the date when she gave definite notice of her intention to retire, and the rule should be the same in all cases of constructive discharge. This is essentially the converse of the discriminatory discharge case where the date the employer gives notice of termination to the employee is controlling for purposes of accrual. In the case of constructive discharge, it is only the employee who can know when the atmosphere has been made so intolerable by the discrimination-motivated employer that the employee must leave. In this, we agree with the Ninth Circuit Court of Appeals

> that the date of discharge triggers the limitations period in a constructive discharge case, just as in all other cases of wrongful discharge. Constructive dis-

charge is, indeed, just one form of wrongful discharge. The fact that the actual act of terminating employment is initiated by the employee, who concludes that she is compelled to leave as a result of the employer's actions, rather than by the employer directly does not change the fact that the employee has been discharged.

*Draper v. Coeur Rochester, Inc.,* 147 F.3d 1104, 1110 (9th Cir.1998).

Although Flaherty met with Kaiser on May 15, 1997 to advise that she was contemplating retirement and to ask about a retirement "package," it was not until June 12, 1997 that she effectively communicated her intention to resign. On that date, she delivered by memorandum a formal statement that she was retiring from her employment at Metromail, effective November 1st. Since that date was within the 300 days of the filing of her complaint with the EEOC, her filing was timely. By this, we express no opinion on the merits of Flaherty's claim of constructive discharge. In view of our determination in this case, it is unnecessary for us to pass on Flaherty's claim that the continuing violation exception would eliminate any time-bar to her constructive discharge cause of action. Finally, we leave it to the district court to determine, in the first instance, whether the Experian entities are proper parties and liable as successors in interest to Metromail.

## CONCLUSION

For the foregoing reasons, we vacate the judgment of the district court in its entirety and remand for further proceedings consistent herewith.