**PUBLISH**

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 28, 2014**

**Elisabeth A. Shumaker**
**Clerk of Court**

MARVIN GREEN,

      Plaintiff - Appellant,

v.

PATRICK R. DONAHOE, Postmaster
General, United States Postal Service,

      Defendant - Appellee.

No.  13-1096

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. No. 1:10-CV-02201-LTB-KMT)**

John Mosby, (Elisa Moran and Marilyn Cain Gordon with him on the briefs), Denver, Colorado, for Plaintiff – Appellant.

Paul Farley, Assistant United States Attorney, (John F. Walsh, United States Attorney, with him on the brief), Denver, Colorado, for Defendant – Appellee.

Before **HARTZ**, **McKAY**, and **MATHESON**, Circuit Judges.

**HARTZ**, Circuit Judge.

Marvin Green, a former postmaster, claims that the U.S. Postal Service retaliated against him after he made employment-discrimination claims. He was investigated, threatened with criminal prosecution, and put on unpaid leave. Shortly after being put on leave, he signed a settlement agreement with the Postal Service that provided him paid leave for three and a half months, after which he could choose either to retire or to work in a position that paid much less and was about 300 miles away. Ultimately, he decided to retire. He then filed a complaint against Defendant Patrick Donahoe, the Postmaster General, in the United States District Court for the District of Colorado, alleging five retaliatory acts in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.: (1) a letter notifying him to attend an investigative interview; (2) the investigative interview; (3) a threat of criminal charges against him; (4) his constructive discharge; and (5) his placement on unpaid leave (also known as emergency placement). The district court dismissed the first three claims for failure to exhaust administrative remedies. On the two remaining claims it granted summary judgment for Defendant, ruling that the constructive-discharge claim was untimely and that emergency placement was not a materially adverse action. This appeal followed.

We have jurisdiction under 28 U.S.C. § 1291. We affirm the judgment below except for the emergency-placement claim. We agree with Green that the emergency placement was a materially adverse action (being put on unpaid leave would dissuade a reasonable employee from engaging in protected activity), and we remand the claim for further proceedings.

2

## I.    BACKGROUND

Green, who describes himself as a black American, began working for the Postal Service in 1973.  He was a manager for 25 years, including 14 years as a postmaster.  From 2002 until his retirement in 2010, he was the postmaster at the Englewood, Colorado, post office.  At the time of the pertinent events, he had no disciplinary report in his permanent file.

In early 2008 a postmaster position opened in Boulder.  Green applied for the position, but his supervisor, Gregory Christ, selected a Hispanic instead.  In August 2008, Green filed a formal charge with the Postal Service's Equal Employment Opportunity (EEO) Office, alleging that he had been denied a promotion because of his race.  That November, after the EEO Office had completed its investigation, Green requested a hearing before the Equal Employment Opportunity Commission (EEOC).  The matter was settled.

In May 2009, Green filed an informal EEO charge alleging that the Postal Service had begun retaliating against him for his prior EEO activity.  He alleged that Christ, his supervisor, had threatened, demeaned, and harassed him.  He filed a similar informal charge in July, alleging that Christ and Jarman Smith, who had replaced Christ as Green's supervisor, had threatened, demeaned, and harassed him because of his race and his EEO activity regarding the Boulder position.  In August the Postal Service's EEO Office completed its investigation of the May and July charges.  It informed Green that he could file a formal charge, but he did not do so.

3

In November 2009, Green received a letter at his home from Charmaine Ehrenshaft, who was the Postal Service's Manager of Labor Relations for his district. The letter instructed Green "to appear for an investigative interview regarding allegations of non-compliance in the grievance procedure." Aplt. App., Vol. 2 at 433. The letter provides no specifics, but Defendant claims that Green was derelict in his handling of employee grievances between April and December of 2009, resulting in multiple adverse decisions that required the Postal Service to pay damages and penalties to grievants. Green asserts that he and his facility managers had contacted the appropriate person for assistance with the grievances but that the person would not help.

Ehrenshaft and her supervisor, David Knight, the Manager of Human Resources, conducted the investigative interview on December 11, 2009. Green was represented by Robert Podio of the National Association of Postmasters. During the interview Knight asked Green about the processing of grievances, about allegations that he had intentionally delayed the mail by failing to timely sign and return receipts for certified letters related to the grievances, and about allegations that he had sexually harassed a female employee.

When the interview ended, two agents from the Postal Service Office of the Inspector General (OIG) arrived. Knight instructed Green to meet with them. The OIG, an independent branch of the Postal Service, had initiated its own investigation into delay of the mail, which can be a federal crime.

4

Knight and Ehrenshaft reappeared when the OIG interview ended. They gave Green a letter informing him that under the Postal Service's emergency-placement policy he was "placed in off-duty status immediately" because of "[d]isruption of day-to-day postal operations." *Id.*, Vol. 3 at 600. It stated that under the policy "[t]he employee is returned to duty status when the cause for nonpay status ceases." *Id.* Knight ordered Green to surrender his Postal Service identification and cell phone and not to return to the Englewood post office.

Unknown to Green, the OIG agents had concluded at the end of the interview that Green had not intentionally delayed the mail. The next day, Podio began negotiating with Knight to resolve the matter. During negotiations Knight e-mailed Podio that the OIG was "all over" the delay-of-mail issue and that "the criminal issue could be a life changer." *Id.*, Vol. 5 at 974.

On December 16, 2009, Green signed a settlement agreement. It provided that he would immediately give up his position as the Englewood postmaster and that he would use accrued annual and sick leave to receive pay until March 31, 2010, after which he could choose either to retire or to accept a position at significantly lower pay in Wamsutter, Wyoming, about 300 miles away. In exchange, the Postal Service agreed that "no charges will be pursued based on the items reviewed during interviews conducted on December 11, 2009." *Id.*, Vol. 3 at 610. After Green signed, he was paid retroactively for the three days he had been on emergency placement.

5

On January 7, 2010, Green met with an EEO counselor and filed an informal charge alleging that he had been retaliated against on December 11, the day of the investigative interview, when he was removed from his postmaster position and was issued the emergency-placement letter. He filed the follow-up formal charge on February 17. The EEO Office dismissed the claim a few days later because Green had entered into a settlement agreement. The EEOC upheld the dismissal in August.

On February 9, 2010, Green submitted his retirement papers, effective March 31, 2010. On March 22 he initiated counseling. The Information for Pre-Complaint Counseling that he signed on March 31 alleged that he had been constructively discharged by being forced to retire. On April 23 he followed up with another formal charge. The EEO Office sent Green a letter on April 26 indicating that it had accepted three claims for investigation: (1) that he was constructively discharged (no date specified); (2) that he was downgraded from a level 22 postmaster to a level 13 postmaster on December 19, 2009; and (3) that his pay-for-performance salary increase was stopped. Green's attorney then sent the EEO Office a letter advising it that "the only issue that should be investigated by you is the constructive discharge claim," because the other two claims had been raised in the earlier February 17 charge and dismissed. *Id.*, Vol. 1 at 83. The EEO Office issued a second acceptance letter acknowledging Green's request and stating that it would investigate only the constructive-discharge claim.

In September 2010 Green filed his complaint in this lawsuit. He filed an amended complaint in July 2011 alleging five retaliatory acts in violation of Title VII: (1) the

letter notifying him of the investigative interview, (2) the investigative interview, (3) the threat of criminal prosecution, (4) his constructive discharge, and (5) the emergency placement.

The district court dismissed the first three claims for lack of subject-matter jurisdiction, ruling that Green had not exhausted his administrative remedies because he had not adequately presented those claims in his EEO charges. It later found that Ehrenshaft had in bad faith destroyed records of postal employees charged with misconduct similar to that alleged against Green. As a sanction, the court said that it would inform the jury that it could infer pretext from the destruction and would consider the same inference in ruling on a pending summary-judgment motion. The possible sanction was mooted, however, because in February 2013 the district court granted summary judgment for Defendant on the remaining claims. It ruled that Green's emergency placement was not a materially adverse employment action and that his constructive-discharge claim was time-barred because he had not contacted an EEO counselor about it within 45 days of December 16, 2009, when he signed the settlement agreement. Green appeals the disposition of all five claims.

II.    DISCUSSION

A.    Title VII Administrative Procedures

A brief summary of administrative procedures under Title VII will help set the stage. To avoid confusion when reading Title VII case law, it is worth noting that the obligations of federal employees are somewhat different from those of other workers.

7

*See Shikles v. Sprint/United Mgmt. Co.*, 426 F.3d 1304, 1311 (10th Cir. 2005). *See generally Laber v. Harvey*, 438 F.3d 404, 416–17 & n.9 (4th Cir. 2006). For private-sector employees, a charge of discrimination must be filed with the EEOC within 180 days, although the time can be extended to as much as 300 days if the claim is pursued initially with a state or local agency empowered to prosecute discriminatory employment practices. *See* 42 U.S.C. § 2000e-5(e)(1).[1] If the EEOC finds no discrimination or is unsuccessful at resolving the claim, the employee can then seek judicial review. *See id.* § 2000e-5(f)(1). Federal employees, however, must begin the process by contacting within 45 days an EEO counselor in the employee's agency. *See* 29 C.F.R. § 1614.105(a)(1).[2] If the counselor does not resolve the matter, the employee can file a

---

[1] The pertinent language of the paragraph is as follows:

> A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred . . . , except that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred, or within thirty days after receiving notice that the State or local agency has terminated the proceedings under the State or local law, whichever is earlier . . . .

42 U.S.C. § 2000e-5(e)(1).

[2] Section 1614.105(a) states in full:

Continued . . .

charge with the employing agency. *See id.* § 1614.106. Once the agency has investigated and issued a final decision, the employee can either appeal to the EEOC and then pursue judicial review, or opt out of further administrative proceedings and file directly in court. *See* 42 U.S.C. § 2000e-16(c); 29 C.F.R. §§ 1614.108-.110, 1614.401, 1614.407.

## B. Exhaustion

Before filing suit under Title VII, a private plaintiff must exhaust administrative remedies. "[E]ach discrete incident of alleged discrimination or retaliation constitutes its own unlawful employment practice for which administrative remedies must be

> Aggrieved persons who believe they have been discriminated against on the basis of race, color, religion, sex, national origin, age, disability, or genetic information must consult a Counselor prior to filing a complaint in order to try to informally resolve the matter.
>
> > (1) An aggrieved person must initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action.
> >
> > (2) The agency or the Commission shall extend the 45-day time limit in paragraph (a)(1) of this section when the individual shows that he or she was not notified of the time limits and was not otherwise aware of them, that he or she did not know and reasonably should not have been known that the discriminatory matter or personnel action occurred, that despite due diligence he or she was prevented by circumstances beyond his or her control from contacting the counselor within the time limits, or for other reasons considered sufficient by the agency or the Commission.

29 C.F.R. § 1614.105(a).

exhausted." *Jones v. UPS, Inc.*, 502 F.3d 1176, 1186 (10th Cir. 2007) (internal quotation marks omitted). Two components of the exhaustion requirement are at issue in this case. The first relates to the content of the administrative charge. To establish exhaustion, a Title VII plaintiff must show that the claim is within the scope of the administrative investigation that could reasonably be expected to follow from the allegations raised in the charge. *See id.* Thus, "the charge must contain facts concerning the discriminatory and retaliatory actions underlying each claim." *Id.* Second, the plaintiff must submit the administrative charge in a timely fashion. *See Sizova v. Nat'l Inst. of Standards & Tech.*, 282 F.3d 1320, 1325–28 (10th Cir. 2002); *Johnson v. Orr*, 747 F.2d 1352, 1356–57 (10th Cir. 1984). Exhaustion serves the dual purposes of "protect[ing] employers by giving them notice of the discrimination claims being brought against them" and "providing the EEOC [or EEO office] with an opportunity to conciliate the claims." *Foster v. Ruhrpumpen, Inc.*, 365 F.3d 1191, 1195 (10th Cir. 2004).

In this circuit the failure to comply with the first component of exhaustion deprives the court of jurisdiction. *See Jones v. Runyon*, 91 F.3d 1398, 1399 (10th Cir. 1996) (Title VII claim by Postal Service employee). But the untimeliness of an administrative claim, although an exhaustion issue, *see Sizova*, 282 F.3d at 1327, is not jurisdictional, *see id.* at 1325.

Defendant filed a motion under Fed. R. Civ. P. 12(b)(1) to dismiss Green's first three claims—based on the letter notifying him of the investigative interview, the investigative interview itself, and the threat of criminal charges—for lack of jurisdiction

10

because Green had not presented them administratively. The district court granted the motion. Defendant then moved for summary judgment on Green's constructive-discharge claim on the ground that it was untimely. The court granted that motion as well. The court based both rulings on undisputed facts regarding the content and timing of Green's administrative charges. Our review of both rulings is de novo. *See Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995) (dismissal for lack of jurisdiction); *Dahl v. Dahl*, 744 F.3d 623, 628 (10th Cir. 2014) (summary judgment). The district court's consideration of the administrative pleadings when ruling on the Rule 12(b)(1) motion was proper. *See Holt*, 46 F.3d at 1003 (court has "wide discretion" to consider documents "to resolve disputed jurisdictional facts under Rule 12(b)(1)"). We affirm the district court's rulings on exhaustion, but our reasoning differs from the district court's on the threat-of-criminal-charge claim.

### 1. Notice and Interview Claims

Green's charge submitted to the EEO Office on February 17, 2010, alleged retaliation and harassment on December 11, 2009, when he was removed from his position and placed on off-duty status. He contends that his claims based on the investigative interview and the letter notifying him of the interview were within the scope of that charge because the investigation into the charge would have included an investigation into the letter and the interview. We disagree.

The February 17 charge does not mention the letter at all, and the single reference to the interview is only that Smith "was not involved." Aplt. App., Vol. 1 at 60. Because

11

the charge did not contain a description of the letter or the interview that would have caused the EEO Office to investigate them as separate instances of discrimination, the district court properly dismissed both claims.

## 2. Threat Claim

The analysis of Green's third claim—based on the threat of criminal prosecution—is a bit more complicated. The factual basis of the claim is contained in his April 23, 2010 charge. The charge alleges that he was constructively discharged by being forced to retire, and it states that the Postal Service intimidated him with a false threat of criminal charges. Green's unedited statement reads:

> Since filling my changes of discrimination the Agency has engaged in harassing, bulling and attempting to force me to quit or retire. I was forced out of my job as Postmaster Englewood, CO EAS-22, by Charmaine Ehrenshaft, or to move to the state of Wyoming about 400 miles from Denver, CO for a Postmaster position EAS-13 without save pay which would be a cut in pay of approximately $38,784.00 dollars and without any relocation cost. They also stopped my 2009, Pay-For-Performance Salary Increase that should have taken place in the month of January 2010. On December 19, 2009, Charmaine Ehrenshaft, downgraded me to an EAS-13 Postmaster Wamsutter, Wyoming. *They also used bulling, harassment, intimidation by possible criminal charges for delay of mail which I never delayed any mail in my Postal Career.*
>
> Alternatively, if I did not retire, a *Criminal Attorney* would cost me to start any where from $25,00.00 to $50,000.00, or if I did not retire, I was ordered to report to the Postmaster position in Wamsutter, Wyoming which is approximately 400 miles from Denver, CO, and be downgraded from a level EAS-22 to a level EAS-13, <u>without saved pay.</u>

*Id.* at 78 (italics added, bold omitted).

In a later communication, however, Green's attorney limited the charge. About two weeks after Green filed the April 23 charge, the EEO Office sent him a letter accepting his complaint for investigation and stating that the investigation would include only the following issues: (1) that he was forced to retire (constructive discharge), (2) that he was downgraded from a level 22 postmaster to a level 13 postmaster, and (3) that his pay-for-performance salary increase was stopped. Green's attorney responded with a letter advising that "the only issue that should be investigated by you is the constructive discharge claim." *Id.* at 83. The EEO Office then issued a second acceptance letter acknowledging Green's request and identifying the constructive-discharge claim as the only claim it would investigate. Thus, Green's attorney took the opportunity to correct the EEO Office's erroneous inclusion of two claims not being raised, yet made no mention that another claim had been omitted. The obvious inference is that the charge had not raised any other claims. *See Velazquez-Ortiz v. Vilsack*, 657 F.3d 64, 72 (1st Cir. 2011). As a general rule, we have liberally construed administrative pleadings, *see UPS*, 502 F.3d at 1186 (EEOC filing); but that practice is limited to pleadings filed without the assistance of counsel, *see Lyons v. England*, 307 F.3d 1092, 1104 (9th Cir. 2002) ("We are required to construe appellants' EEOC charges with utmost liberality since they are made by those unschooled in the technicalities of formal pleading." (internal quotation marks omitted)); *Mitchell v. City & Cnty. of Denver*, 112 F. App'x 662, 667 (10th Cir. 2004) ("This more lenient pleading standard contemplates the fact that administrative charges . . . are regularly filled out by employees who do not have the benefit of

13

counsel."); *cf. Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("A document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." (citations and internal quotation marks omitted)).

Nevertheless, the charge may have been adequate. Exhaustion depends on whether "the charge . . . contain[s] facts concerning the discriminatory and retaliatory actions underlying [the] claim." *Jones*, 502 F.3d at 1186. And the April 23 charge certainly contains facts concerning the alleged threat of criminal prosecution. Green did not necessarily withdraw his factual allegations when he withdrew all his claims other than constructive discharge; he may have based that claim in part on any discriminatory act against him, including the alleged threat of prosecution. Hence, we are reluctant to affirm dismissal of this claim on the ground that it was not included in his charge.

Green's escape from dismissal, however, is short-lived. The claim was untimely. Under 29 C.F.R. § 1614.105(a)(1), a federal employee "must initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action." It is undisputed that the alleged threat of criminal prosecution occurred in December 2009. The March 2010 consultation was well past the 45-day deadline.

### 3. Constructive-Discharge Claim

"Constructive discharge occurs when an employer unlawfully creates working conditions so intolerable that a reasonable person in the employee's position would feel

14

forced to resign." *Lockheed Martin Corp. v. Admin. Review Bd.*, 717 F.3d 1121, 1133 (10th Cir. 2013) (internal quotation marks omitted). Green claims that harassment and bullying by the Postal Service forced him to retire. The district court, however, held that the claim was time-barred because all the allegedly discriminatory actions occurred by December 16, 2009, so his March 22, 2010 contact with the EEO office about his constructive discharge was beyond the 45-day deadline of 29 C.F.R. § 1614.105(a)(1). We agree with the district court.

Green argues that the 45-day limitations period did not begin to run until he announced his resignation, even though that was well after the last alleged discriminatory act against him. In our view, however, the start of the limitations period for constructive-discharge claims is the same as for other claims of discrimination.

To reach that conclusion, we begin by reviewing the rationale behind recognition of constructive discharge as a distinct claim. The chief function of such a claim is to expand the remedies available to an employee subjected to improper employer conduct. Ordinarily, an employee who quits a job after employer misconduct is treated as having voluntarily left the employment and is not entitled to reinstatement or to damages, such as back pay, resulting from having left the job. *See Mallinson-Montague v. Pocrnick*, 224 F.3d 1224, 1236–37 (10th Cir. 2000) (employees who resigned after being sexually harassed were not entitled to back or front pay because they had not been constructively discharged); *Derr v. Gulf Oil Corp.*, 796 F.2d 340, 342 (10th Cir. 1986) ("[T]he remedies of back pay and reinstatement are not available . . . unless [the plaintiff] was

15

constructively discharged."). But employers should not be able to escape such remedies simply by making the job so intolerable that the employee resigns, making it unnecessary to fire him. *See* 1 Barbara T. Lindemann et al., Employment Discrimination Law 21-33 (5th ed. 2012) ("An employer . . . should not be able to accomplish indirectly what the law prohibits being done directly."). To deal with that circumstance, various tribunals have embraced the concept of constructive discharge. Apparently the first to do so was the National Labor Relations Board (NLRB) in the 1930s in the context of alleged unfair labor practices. *See Pa. State Police v. Suders*, 542 U.S. 129, 141 (2004). If there had been a constructive discharge, the NLRB could order reinstatement and backpay, remedies otherwise available only if the worker had been fired. *See Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 888, 902 (1984) (holding that NLRB could order reinstatement with back pay as a remedy for constructive discharge); *In re Sterling Corset Co., Inc.*, 9 N.L.R.B. 858, 871 (1938) (ordering reinstatement and back pay as a remedy for constructive discharge). Courts have since recognized constructive-discharge claims in a variety of contexts, including Title VII, to enhance damages. *See Suders*, 542 U.S. at 142. Courts treat "a constructive discharge [as] functionally the same as an actual termination *in damages-enhancing respects*." *Id.* at 148 (emphasis added).

But when should a constructive-discharge claim accrue? For most federal limitations periods, "the clock starts running when the plaintiff first knew or should have known of his injury." *Almond v. Unified Sch. Dist. No. 501*, 665 F.3d 1174, 1176 (10th Cir. 2011). In the employment-discrimination context, "this rule generally means that a

16

claim accrues when the disputed employment practice—the demotion, transfer, firing, refusal to hire, or the like—is first announced to the plaintiff." *Id.* at 1177. Unlike formal discharges, however, "[a] constructive discharge involves *both* an employee's decision to leave and [the employer's] precipitating conduct." *Suders*, 542 U.S. at 148 (emphasis added). This feature creates interesting issues regarding when such a claim accrues, and hence when a claim is untimely.

The interesting issue here is whether the date of accrual can be postponed from the date of the employer's misconduct until the employee quits or announces his future departure. Supporting such postponement is that quitting is an element of the claim, *see Mac's Shell Serv., Inc. v. Shell Oil Prods. Co.*, 559 U.S. 175, 184 (2010) ("To recover for constructive discharge, . . . an employee generally is required to quit his or her job."), and generally a claim does not accrue before all its elements can be satisfied, *see Wallace v. Kato*, 549 U.S. 384, 388 (2007) ("[I]t is the standard rule that accrual occurs when the plaintiff has a complete and present cause of action." (brackets and internal quotation marks omitted)).

Few court opinions have discussed the issue, either under Title VII or in other contexts. Of these, it appears that the majority have said that the constructive-discharge claim accrued when the employee gave notice of departure. In most of these decisions, however, the court had no occasion to choose between the date of the employer's last misconduct and the employee's resignation announcement. *See, e.g., Jeffery v. City of Nashua*, 48 A.3d 931, 936 (N.H. 2012) (plaintiff unsuccessfully argued that claim

17

accrued on effective date of resignation, not when she gave notice of resignation);

*Patterson v. Idaho Dept. of Health & Welfare*, 256 P.3d 718, 725 (Idaho 2011) (same);

*Whye v. City Council*, 102 P.3d 384, 387 (Kan. 2004) (same); *Hancock v. Bureau of Nat'l*

*Affairs, Inc.*, 645 A.2d 588, 590 (D.C. 1994) (same).

Still, in several decisions under Title VII, courts have said that a claim accrued on

the date the employee resigned. *See Flaherty v. Metromail Corp.*, 235 F.3d 133, 138 (2d

Cir. 2000); *Draper v. Coeur Rochester, Inc.*, 147 F.3d 1104, 1111 (9th Cir. 1998); *Young*

*v. Nat'l Center for Health Servs. Research*, 828 F.2d 235, 237–38 (4th Cir. 1987). The

reasoning in *Young* was as follows:

> [*T*]*he applicable administrative deadlines run from the time of the
> discriminatory act*, not from the time of a later, inevitable consequence of
> that act. Whether an employer's action is a "discriminatory act" or merely
> an "inevitable consequence" of prior discrimination depends on the
> particular facts of the case. A resignation is not itself a "discriminatory act"
> if it is merely the consequence of past discrimination, but *if the employer
> discriminates against an employee and purposely makes the employee's job
> conditions so intolerable that a reasonable person would feel forced to
> resign, then the resignation is a constructive discharge—a distinct
> discriminatory "act" for which there is a distinct cause of action.*

828 F.2d at 237–38 (emphasis added) (citations omitted); *accord Draper*, 147 F.3d at

1110–11 (quoting *Young*); *Flaherty*, 235 F.3d at 138 (quoting *Young* and saying that

cause of action accrued when employee gave notice of intent to retire).

Perhaps these decisions of our sister circuits could be distinguished on the ground

that the last act of discrimination was within the limitations period. But in any event, we

cannot endorse the legal fiction that the employee's resignation, or notice of resignation,

18

is a "discriminatory act" of the employer. Such a fiction stretches the language of 29 C.F.R. § 1614.105(a)(1) too far. The regulation provides that federal employees "must initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action,[3] within 45 days of the effective date of the action." *Id.* And the Supreme Court has said that "the proper focus is upon the time of the *discriminatory acts*, not upon the time at which the *consequences* of the acts became most painful." *Del. State Coll. v. Ricks*, 449 U.S. 250, 258 (1980) (internal quotation marks omitted). "Mere continuity of employment, without more, is insufficient to prolong the life of a cause of action for employment discrimination." *Id.* at 257. Of particular concern is that delaying accrual past the date of the last discriminatory act and setting it at the date of notice of resignation would run counter to an essential feature of limitations periods by allowing the employee to extend the date of accrual indefinitely, thereby "placing the supposed statute of repose in the sole hands of the party seeking relief." *Wallace*, 549 U.S. at 391. As previously noted, the Supreme Court has stated that "a constructive discharge is functionally the same as an actual termination in *damages-enhancing respects*." *Suders*, 542 U.S. at 148 (emphasis added). It does not follow, however, that it should be treated as the functional equivalent for purposes of the limitations period.

---

[3] We are uncertain of the meaning of *personnel action* in the regulation, but we have no doubt that it must refer to the acts of the employer, not the employee, and Green has not suggested that his notice of resignation was a personnel action under the regulation.

19

No policy reason, certainly not the policy behind recognition of constructive-discharge claims as a means to provide appropriate relief to employees, commends itself as a ground for postponing the accrual of constructive-discharge claims until the employee leaves work. Such postponement would be contrary to the proposition that "society and the policies underlying Title VII will be best served if, wherever possible, unlawful discrimination is attacked within the context of existing employment relationships." *Derr*, 796 F.2d at 342–43 (internal quotation marks omitted).

There is certainly merit to the view that the employee should have time to contemplate whether the employer's misconduct has become intolerable. But the employee need not raise the claim instantaneously. The limitations period provides time for contemplation. Indeed, the EEOC took this consideration into account in setting the 45-day limit for claims, despite arguments that more time was necessary "to reflect, secure advice, or realize the impact of a discriminatory action." 57 Fed. Reg. 12634, 12634 (Apr. 10, 1992). It is not our office to expand the time limits beyond what the EEOC has set.

We recognize that an employee cannot file suit before presenting a charge in administrative proceedings, and a constructive-discharge charge cannot be submitted before the employee quits his job. But exhaustion of a Title VII claim requires only that "the charge . . . contain facts concerning the discriminatory and retaliatory actions underlying [the] claim." *Jones*, 502 F.3d at 1186. The charge need not allege that the employee responded to the improper action by quitting. And an employee who later

20

decides he cannot take it any longer and therefore quits his job could likely amend a timely charge to include an allegation of constructive discharge. *See* 29 C.F.R. § 1601.12(b) (permitting amendments).

We therefore agree with the courts that have required some discriminatory act by the employer within the limitations period. *See Mayers v. Laborers' Health & Safety Fund*, 478 F.3d 364, 367, 370 (D.C. Cir. 2007) (notice of resignation was within limitations period but no discriminatory act of employer was); *Davidson v. Ind.-Am. Water Works*, 953 F.2d 1058, 1059–60 (7th Cir. 1992) (same).[4]

Green does not claim that the Postal Service did anything more to him after December 16, 2009, the day he signed the settlement agreement. He first initiated EEO counseling on his constructive-discharge claim on March 22, 2010, well beyond 45 days later. That was too late.

## C.    Emergency-Placement Claim

Finally, we consider the emergency-placement claim. The district court dismissed the claim on summary judgment. "We review the district court's grant of summary judgment de novo, applying the same standards that the district court should have applied." *Dahl*, 744 F.3d at 628 (internal quotation marks omitted). Summary judgment

---

[4] The Seventh Circuit later described *Davidson* as agreeing with *Flaherty* and *Draper*. *See Cigan v. Chippewa Falls Sch. Dist.*, 388 F.3d 331, 334 (7th Cir. 2004) ("Like other circuits, we have held that the clock starts with the events that constitute a constructive discharge."). But *Cigan* held that the employee had not been constructively discharged, *see id.*, and it did not purport to overrule *Davidson*.

21

is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[W]e examine the record and all reasonable inferences that might be drawn from it in the light most favorable to the non-moving party." *Dahl*, 744 F.3d at 628 (internal quotation marks omitted).

Green claims that his emergency placement was retaliation for his protected conduct of filing his 2008 EEO charge (which alleged that the Postal Service discriminatorily denied him the Boulder postmaster position) and his 2009 charge (which alleged that the Postal Service retaliated against him for his 2008 charge). An employee who does not have direct evidence of retaliation may prove such a claim under the three-step framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Debord v. Mercy Health Sys. of Kan., Inc.*, 737 F.3d 642, 655 (10th Cir. 2013). The employee must first establish a prima facie case that the action taken by the employer was retaliation for protected conduct by proving "(1) that he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." *Somoza v. Univ. of Denver*, 513 F.3d 1206, 1212 (10th Cir. 2008) (internal quotation marks omitted). The challenged action is materially adverse if "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* (internal quotation marks omitted). If the prima facie case is made, the burden shifts to the employer to respond with

22

"legitimate, nonretaliatory reasons" for its actions. *Debord*, 737 F.3d at 655 (brackets and internal quotation marks omitted). If the employer does so, the burden shifts back to the employee to show that the employer's "stated reasons were pretextual." *Id.*

In granting Defendant summary judgment, the district court held that Green could not prove that his emergency placement was materially adverse. We disagree.

On appeal Defendant argues that the emergency placement was not materially adverse for several reasons: (1) Green does not "take issue" with the district court's determination that there is no evidence that the placement was materially adverse, Aplee. Br. at 40; (2) Green never missed a regular paycheck, so the emergency placement was equivalent to administrative leave, which has not been considered materially adverse; and (3) Green does not dispute that the placement did not dissuade him from engaging in protected activities.

We are not persuaded. In our view, Green adequately preserved below and on appeal his claim that the placement was materially adverse. As for Defendant's second argument, it misses a key fact: Although Green did not miss a paycheck, he did not know that he would be paid when he was handed the letter notifying him of the emergency placement. The letter referred to the placement as "nonpay status," and said that the status would "continue until you are advised otherwise." Aplt. Appl, Vol. 3 at 600. Green later received his regular paycheck only because he agreed to a settlement with the Postal Service, a settlement that he may have been induced to accept so that he could be paid. Indeed, Knight testified as follows:

23

> Q:  Why did you tell Mr. Podio that you would not pay [Green]?
>
> A:  It's my right.  If we're going to negotiate a settlement, that's a negotiation tool.

*Id.*, Vol. 5 at 1022.  As we have said, "Actions such as suspensions or terminations are by their nature adverse, even if subsequently withdrawn." *Roberts v. Roadway Express, Inc.*, 149 F.3d 1098, 1104 (10th Cir. 1998).  We do not doubt that losing one's income could "dissuade[] a reasonable worker from making or supporting a charge of discrimination." *Somoza*, 513 F.3d at 1212 (internal quotation marks omitted); *see Coleman v. Donahoe*, 667 F.3d 835, 860 (7th Cir. 2012) (postal employee's placement "on unpaid off-duty status" was an adverse employment action); *Scott v. Potter*, 182 F. App'x 521, 524 (6th Cir. 2006) (expressing "no doubt" that postal employee's emergency placement was an adverse employment action).  The possibility that one could recover that income by caving to the employer's demands would not provide much comfort.

Finally, Green's admittedly continuing to engage in protected activities (such as filing more charges) after the emergency placement does not affect our conclusion.  True, "the fact that an employee continues to be undeterred in his or her pursuit of a remedy . . . may shed light as to whether the actions are sufficiently material and adverse to be actionable." *Somoza*, 513 F.3d at 1214.  But here the obvious consequence of the placement was to induce Green to settle on terms favorable to the Postal Service.  And once he had settled (particularly after he decided to quit), there was little the Postal Service could do to retaliate against him for his subsequent claims of discrimination.

24

More importantly, we look at the likely effect of the adverse action on a "reasonable worker." *Id.* at 1212 (internal quotation marks omitted). Green does not lose his claim just because he may be more resilient than most. We repeat that a reasonable worker would be deterred by cutting off his pay.

Whether Green can establish the other elements of his emergency-placement claim and what damages, if any, he may be entitled to are unclear. But we leave that to the district court to decide in the first instance.

## III. CONCLUSION

We AFFIRM the district court's dismissal of the claims based on the investigative-interview letter, the investigative interview itself, the threat of criminal charges, and the alleged constructive discharge. We REVERSE summary judgment for Defendant on the emergency-placement claim, and we REMAND for proceedings consistent with this opinion.