**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 25, 2015**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

RHONDA F. TADLOCK,

      Plaintiff-Appellant,

v.

MARSHALL COUNTY HMA, LLC,
d/b/a Integris Marshall County
Medical Center,

      Defendant-Appellee.

No. 14-6085
(D.C. No. 5:13-CV-00655-R)
(W.D. Okla.)

**ORDER AND JUDGMENT**[*]

Before **BRISCOE,** Chief Judge, **MURPHY** and **MATHESON**, Circuit Judges.

Rhonda Tadlock filed claims against Marshall County HMA ("the

hospital") for discrimination based on a disability under the Americans with

Disabilities Act (ADA), workers' compensation retaliation under Oklahoma law,

and interference with Family Medical Leave Act (FMLA) rights. The district

court granted summary judgment to the hospital on the ADA discrimination and

---

[*] This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

workers' compensation retaliation claims, but allowed the FMLA interference claim to go to trial. Following a three-day trial, the jury found in the hospital's favor. Tadlock challenges both summary judgment rulings and contends that the court made a number of trial errors that require reversal of the jury verdict. We affirm the district court's ruling on the workers' compensation retaliation claim and the jury's verdict on the FMLA claim. We reverse the grant of summary judgment on the ADA claim and remand the issue for further proceedings.

## I.

### A. Factual background

Rhonda Tadlock was hired as the dietary manager at Integris Marshall County Medical Center (the predecessor to Marshall County HMA) in Madill, Oklahoma, in May 2007. While performing her job, Tadlock fell on two separate occasions—once in 2011 and once in 2012. Both falls necessitated trips to the emergency room. After the 2012 fall, Tadlock was diagnosed with degenerative disc disease and was prescribed pain medication. She did not receive follow-up physical therapy or referrals to other doctors after either fall. Tadlock had also been diagnosed with Type II diabetes prior to the falls.

In April 2012, the hospital's ownership changed from Integris to Marshall County HMA. According to Tadlock's supervisor Holly Bain, the transition to new management was stressful for all employees. Tadlock's dietary department lost at least one employee, and Tadlock requested on multiple occasions that the

2

hospital post an opening for the department because she was having to repeatedly work overtime hours. Tadlock said she spoke to Bain on April 27, 2012, and specifically mentioned her pain issues as well as concerns about being on her feet constantly as a diabetic person. Bain confirmed that she spoke to Tadlock about possibly getting spongy mats in the kitchen, but did not recall whether any specific ailments were mentioned.

Tadlock sent several emails to her supervisors in the months prior to her departure from the hospital that expressed criticism of the transition to new management. For example, she stated in an email on April 25, 2012, that employee morale was low, that lower-level employees were not being adequately informed about the transition, and that she "hope[d] [she didn't] get retaliated against because [she] just so happen[s] to be one of those 'stupid' people who speaks their mind on occasion." App. at 138.[1] At a management meeting on April 30, 2012, meeting minutes reflected that Tadlock said she had two interviews scheduled and "[w]/in 2 wks shld be gone from here," "[h]ave house for sale." Id. at 145. Tadlock said that she did not resign at the meeting and that she spoke to Bain on May 2 to confirm that she had not resigned. Bain confirmed that she spoke to Tadlock on May 2, but said Tadlock did not rescind her resignation.

---

[1]Tadlock had been formally disciplined twice in her five years working at the hospital for "unprofessional behavior" and "explosive behavior," including a purported resignation in December 2011 that was later retracted. App. at 186-91.

3

Tadlock submitted requests for days off on May 1, May 9, and May 10; however, her requests were reportedly not made in accordance with hospital policy. Tadlock also sent her supervisor a message one hour before her shift on May 8 to explain that she was not coming in because she was "worn out" and wanted to use a sick day. Id. at 185. She filed paperwork for a workers' compensation injury on May 2, 2012, citing her 2012 fall as the injury and stating that her "head, neck, low back, left hip, [and] left leg" were injured. Id. at 155. The hospital received her workers' compensation attorney's request for medical records on May 3, 2012. On May 9, 2012, Tadlock was placed on temporary total disability by Dr. Lonnie Litchfield, whom she saw on the advice of her workers' compensation attorney. That same day, Tadlock also talked to a hospital human resources employee about getting paperwork to take FMLA leave.

However, Tadlock never received the FMLA paperwork because Bain, in conjunction with the hospital's human resources director, Lori Friend, and a regional human resources director, made a joint decision on May 10, 2012, to accelerate Tadlock's alleged resignation to an effective date of May 7, 2012.[2] Tadlock received the letter accelerating her resignation on or about May 11, 2012.

### B. Procedural background

Tadlock sent a letter, with many of her email communications with hospital

---

[2]Bain said that had Tadlock not resigned, she would not have recommended terminating Tadlock for her absences or attitude, but would have given her verbal counseling.

4

staff attached, to the Equal Employment Opportunities Commission (EEOC) office in Oklahoma City in October 2012. In her letter, Tadlock stated that she wanted to make a retaliation complaint against Marshall County HMA and described the circumstances of her separation from the hospital. In particular, she noted that she had been injured on the job and had requested that a currently vacant position in her department be filled because she could not do some of the physical labor that had been asked of her in recent months. She said she had discussed leaving her job if the hospital did not fill the vacant position and that her statements had been interpreted as a resignation, which she believed was in retaliation for "st[icking] my neck out to make our working environment more productive." App. at 221-22. She noted that she had been in touch with a workers' compensation attorney, but appeared to state that she had not been given advice about filing an EEOC complaint.

The EEOC responded by sending a questionnaire to Tadlock to obtain more information about her allegations. Tadlock completed the questionnaire, which the EEOC received on November 2, 2012, and checked only the box labeled "retaliation" (as opposed to disability or sex or age) as the basis for her claim. Tadlock also referred to her "first mailing" when asked to described why she thought her separation from the hospital was retaliatory. Id. at 204. On the form, she did not claim to have a disability or respond to any questions specifically designated for those alleging disability discrimination, but did list the names of

5

her two workers' compensation lawyers as people from whom she "sought help about this situation." Id. at 205-06. An EEOC investigator interviewed Tadlock later in November and the EEOC created a formal charge on her behalf in December 2012 that stated she was making a retaliation claim under Title VII. The letter from the EEOC processing her charge also indicated that the charge fell under Title VII, not the Americans with Disabilities Act. The EEOC issued Tadlock a right-to-sue letter on that charge on January 8, 2013.

Tadlock then obtained a lawyer for her retaliation claims, who advised her to resubmit a charge of discrimination on disability grounds. The attorney sent the new charge of discrimination to the EEOC in February 2013 with an accompanying letter stating he believed the original charge was deficient as to Tadlock's ADA claims. The second charge listed both disability and retaliation as the bases for Tadlock's claims and stated that she was disabled due to "ruptured and/or bulging disks and nerve compression" that caused "exhaustion from standing for long periods, trouble sitting for extended periods, and [trouble] caring for [her]self." Id. at 240. The charge stated her disability came from on-the-job injuries and that Tadlock believed she was discharged after submitting a notice of temporary total disability to her employer. The EEOC responded on June 5, 2013, stating that "we do not believe further investigation will result in concluding that a violation of statute(s) occurred," and issued a second right-to-sue letter. Id. at 239, 242.

6

Tadlock filed suit against the hospital on June 21, 2013, alleging discrimination based on a disability under the ADA, retaliation for exercising workers' compensation rights under Oklahoma law, and interference with FMLA rights. The hospital filed for summary judgment on all claims, arguing (1) that Tadlock's disability claim was untimely because it had been filed more than 90 days after she had received the first right-to-sue letter and that regardless, she had not established a prima facie case of discrimination, (2) that her FMLA claim must fail because her "employment with the Hospital ended before her request for FMLA began" and she had not established a prima facie case for interference, and (3) that her workers' compensation retaliation claim must fail because Oklahoma law requires more concrete evidence than temporal proximity to establish a prima facie case. Id. at 32-54.

The district court granted summary judgment to the hospital on Tadlock's ADA and workers' compensation claims. The court concluded that Tadlock's ADA claim was time-barred because she did not file suit within 90 days after the EEOC issued her a right-to-sue letter as required by statute. 42 U.S.C. § 2000e-5(f)(1). Although her original charge did not specify disability discrimination on its face, the court concluded that because courts must "liberally construe charges filed with the EEOC in determining whether administrative remedies have been exhausted as to a particular claim," it was permitted to consider the facts alleged in Tadlock's original letter to the EEOC to determine what the EEOC reasonably

7

would have investigated. App. at 613 (citing Jones v. UPS, Inc., 502 F.3d 1176, 1186 (10th Cir. 2007)). Because Tadlock "never mentioned anything" regarding her gender, race, or national origin in the letter, questionnaire, or charge, the court concluded that the only plausible protected basis for her retaliation claim was disability. Id. at 615. Thus, the court concluded her ADA claim was covered by the first charge and right-to-sue letter and her federal lawsuit was untimely. The district court also granted summary judgment to the hospital on Tadlock's workers' compensation retaliation claim, concluding that Tadlock did not provide sufficient evidence under Oklahoma law that her termination was a "consequence" of her efforts to obtain workers' compensation. Id. at 620-22.

However, the district court denied summary judgment to the hospital on Tadlock's FMLA interference claim, concluding that "[t]he temporal proximity between Plaintiff's FMLA request and the letter accelerating her purported resignation suffices to suggest that Defendants' action was related to Plaintiff's attempt at exercising her FMLA rights." Id. at 617-19. The court rejected the hospital's argument that Tadlock's alleged resignation and post-resignation behavior constituted a valid reason for Tadlock's separation due to "genuine disputes" as to whether Tadlock actually resigned. Id. at 619. After a trial in March 2014, a jury found in favor of the hospital on the FMLA claim.

## II.

### A. Claims resolved on summary judgment

*i. Standard of review*

"We review the district court's grant of summary judgment de novo, applying the same standards that the district court should have applied." Green v. Donahoe, 760 F.3d 1135, 1146 (10th Cir. 2014) (internal citation and quotation marks omitted). We may grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "[W]e examine the record and all reasonable inferences that might be drawn from it in the light most favorable to the non-moving party," which in this case is Tadlock. Green, 760 F.3d at 1146 (internal citation and quotation marks omitted).

*ii. ADA claims*

The district court granted summary judgment to the hospital because it concluded that Tadlock's first right-to-sue letter from the EEOC encompassed her right to sue on her disability claims and that, as a result, her ADA claims were not timely. Tadlock argues that the district court erred in making this determination, and we agree. However, we reverse the summary judgment ruling only as to her claimed disabilities that have been administratively exhausted before the EEOC, which we determine to include her back injuries but not her Type II diabetes.

Exhaustion of administrative remedies for federal employment

discrimination claims "is a jurisdictional prerequisite to suit." Jones, 502 F.3d at 1183. Under 42 U.S.C. § 2000e-5(e)(1), a party who wishes to pursue a claim of employment discrimination in federal court must first file a formal charge with the EEOC within 300 days of the "alleged unlawful employment practice." If the EEOC does not wish to pursue the claim on the party's behalf, it will issue a "right-to-sue letter," and under 42 U.S.C. § 2000e-5(e)(1), the party has 90 days after receiving such a letter to file a lawsuit. If the claimant fails to file suit within 90 days, the claims alleged in the EEOC charge are foreclosed, even if the 300-day period for filing charges with the EEOC has not elapsed. See Brown v. Unified Sch. Dist. 501, Topeka Pub. Sch., 465 F.3d 1184, 1186 (10th Cir. 2006).

Frequently, however, plaintiffs amend their claims in employment discrimination lawsuits factually and legally from what was presented to the EEOC, and we must analyze whether a plaintiff has sufficiently presented her current claims to the EEOC. In Jones, a case on which the district court relied, we stated that although charges are to be "liberally construe[d]" in the favor of the plaintiff, "our inquiry is limited to the scope of the administrative investigation that can reasonably be expected to follow from the discriminatory acts alleged in the administrative charge." 502 F.3d at 1186 (emphasis in original omitted). The question before us in this case is whether Tadlock's ADA claims were covered by her original EEOC charge, which on its face claimed only "retaliation" as a basis for discrimination and stated that the retaliation was based

10

on Title VII, not the ADA.

When determining what the EEOC likely investigated, we have said, "[t]he failure to mark a particular box creates a presumption that the charging party is not asserting claims represented by that box. The presumption may be rebutted, however, if the text of the charge clearly sets forth the basis of the claim." Id. (internal citation omitted). In Jones, we concluded that the plaintiff had exhausted his administrative remedies as to an ADA claim because, despite not checking the appropriate box on his EEOC questionnaire, he had made other comments on the questionnaire indicating he had a work-related injury. Id. at 1186-87. For example, he stated that he felt that UPS had unfairly refused to allow him to return to full duty. Id. at 1187. He also filled out a section of the questionnaire devoted to making a disability claim. Id. at 1186-87. Based on the entirety of the questionnaire, the court determined that the EEOC reasonably would have investigated Jones's disability claims. Id. at 1187.

However, Jones is distinguishable from the instant case. In Jones, we were attempting to divine from Jones's questionnaire what the EEOC investigated before it issued him a generic right-to-sue letter; there was no formal charge of discrimination stating the basis of Jones's claim. In contrast, the EEOC in this case prepared a charge on Tadlock's behalf, and that charge referred only to Tadlock's belief that she was retaliated against on Title VII grounds. There is no reasonable explanation as to why EEOC staff would not have checked the

11

"disability" box for Tadlock if they actually thought she was pursuing a disability claim based on her initial letter and questionnaire. We decline to infer that the EEOC reasonably investigated the possibility of an ADA claim when it made no indication of such an investigation in its documentation of Tadlock's claim. Therefore, we conclude that Tadlock's ADA claim was administratively exhausted by her second EEOC charge, not her first, and is timely.

The hospital argues that a second right-to-sue letter can only extend the deadline to file a suit if the EEOC has reconsidered the charge on its merits or if new facts or evidence are presented. However, the cases cited by the hospital—Washington v. City of Gulfport, 2008 WL 4793757 (S.D. Miss. Oct. 27, 2008) and Sparks v. Lowe's Home Center, Inc., 341 F. Supp. 2d 671 (E.D. Tex. 2004)—are not persuasive on either score. First, they are factually distinguishable. In Washington, the district court dismissed a claim against the city as untimely when the plaintiff had filed an earlier EEOC charge against the city and a later charge against a different entity; there was no question that the earlier right-to-sue letter covered the city and the alleged discrimination at issue. See 2008 WL 4793757, at *1-2. In Sparks, both EEOC charges at issue claimed discrimination under the ADA on their face. 341 F. Supp. 2d at 672-74. Moreover, neither adequately addresses the law of this circuit. Although Sparks states that a right-to-sue deadline can only be extended if the EEOC chooses to reconsider the case, id., our caselaw does not indicate any such requirement and

12

appears generally favorable to the idea that plaintiffs may file additional charges based on new facts or legal theories. See Gunnell v. Utah Valley State Coll., 152 F.3d 1253, 1260 (10th Cir. 1998) (noting plaintiff's discussion of sex discrimination in a charge alleging retaliation would have been considered a "prelude" or "explanation" of the grounds for retaliation rather than a separate claim had she not amended the charge with the EEOC). The hospital also makes much of the fact that Tadlock had consulted with a workers' compensation attorney at the time she began the EEOC administrative process, but Tadlock's letter to the EEOC raises an issue of fact as to whether she actually received advice from that attorney about an EEOC complaint.

Having concluded Tadlock's ADA claim is not time-barred, we must next analyze whether she exhausted her administrative remedies as to her claimed disabilities. Her second EEOC charge stated that she was discriminated against based on disc and nerve conditions caused by an on-the-job injury. However, in response to the hospital's summary judgment motion, she amended her disability to include her non-injury-related degenerative disc disease and Type II diabetes. A liberal reading of the charge would encompass the degenerative disc disease. The definition of "disability" under the ADA does not require that the EEOC analyze the cause of the disability, but rather determine whether it "substantially limits one or more major life activities of [an] individual." 42 U.S.C. § 12102(1)(A). Tadlock provided a relatively clear description of her back

13

injuries in her second charge and stated that they caused "exhaustion from standing or walking for long periods, trouble sitting for extended periods, and caring for myself." App. at 240. Such allegations are sufficient to exhaust her remedies as to degenerative disc disease, which contributed to the disc and nerve issues stated on the claim.

However, Tadlock did not state in her charge that she was discriminated against based on her Type II diabetes. There is a brief reference to diabetes in the email print-outs that accompanied her first charge of discrimination. Id. at 225 ("I told you about my toe and how I was worried about it because I am diabetic."). But we conclude that is insufficient to exhaust her administrative remedies as to that claimed disability. MacKenzie v. City & Cnty. of Denver, 414 F.3d 1266, 1274 & n.13 (10th Cir. 2005) (concluding a plaintiff did not exhaust her remedies for a disability claim based on depression when she originally claimed her disability was coronary disease).

The hospital also argues Tadlock has not established a prima facie case of disability discrimination because she did not establish she was a qualified individual with a disability under the ADA. 42 U.S.C. § 12102(1)(A) ("a physical or mental impairment that substantially limits one or more major life activities of such individual"). "To establish a prima facie case of discrimination under the ADA, Plaintiff must demonstrate (1) that [s]he is 'disabled' within the meaning of the ADA, (2) that [s]he is qualified—with or without reasonable accommodation;

14

and (3) that [s]he was discriminated against because of h[er] disability." Butler v. City of Prairie Vill., Kan., 172 F.3d 736, 748 (10th Cir. 1999) (internal quotation marks omitted). In particular, the hospital argues that because Tadlock's claim was based on a temporary, injury-related condition, she has not established that she is disabled. Aplee. Br. at 13 (citing Bush v. Donahoe, 964 F. Supp. 2d 401, 417 (W.D. Pa. 2013)). Without belaboring the point, the summary judgment record on her disability contains medical records that establish at least a genuine issue of fact as to the existence of a long-term disability. Tadlock also claimed in her second EEOC charge she had difficulty standing, walking, or sitting for extended periods of time, which would constitute one of more major life activities under 42 U.S.C. § 12102(2)(A), and her medical records support such claims.[3]

The hospital also argues that Tadlock did not establish the third element of the prima facie case, that her separation occurred "under circumstances which give rise to an inference that the termination was based on her disability." Aplee. Br. at 14 (citing Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997)).

---

[3]Notably, the second element of the prima facie case is not discussed by either party in detail. Tadlock pleaded in her complaint that she was able to perform her "sedentary" managerial job without accommodation and that it was just the additional duties and overtime that had caused problems with her disability. App. at 3. Although the hospital submitted evidence that the job description listed the dietary manager job as requiring being on one's feet for two-thirds or more of the time, such descriptions are not dispositive in our analysis of whether someone is able to perform the essential functions of her job, nor did the hospital dispute on summary judgment or on appeal that Tadlock was qualified. Hennagir v. Utah Dep't of Corr., 587 F.3d 1255, 1262 (10th Cir. 2009) (listing factors).

15

Moreover, the hospital argues that it provided a legitimate, non-discriminatory reason for accelerating her resignation, and that Tadlock did not provide sufficient evidence to rebut those reasons as pretextual. We disagree. Tadlock correctly points to the temporal proximity between her discussions with hospital superiors about her physical injuries and requests for time off and her eventual separation from the hospital as something that could both satisfy the third element of the prima facie case and "lend support to the pretext analysis." Aplt. Reply Br. at 7; see Pastran v. K-Mart Corp., 210 F.3d 1201, 1206 (10th Cir. 2000) ("Close temporal proximity between the employee's complaint and the adverse employment action is a factor in determining whether the employer's proffered reason is a pretext for retaliation.").

Regardless, Tadlock notes that it is often inappropriate for an appellate court to serve as a fact finder in cases such as these, and we agree. Schiller v. Moore, 30 F.3d 1281, 1284 (10th Cir. 1994) ("While it is true that we review the district court's decision *de novo*, it is not appropriate for us to make factual findings on appeal."). The district court made no factual findings as to whether Tadlock had met her burden of establishing a prima facie case, and we therefore remand the case to the district court for further proceedings on this claim.

*iii. Workers' compensation retaliation claim*

Under Oklahoma law, an employee alleging retaliation based on a workers' compensation claim must prove: "1) employment; 2) a job related injury; 3)

16

medical treatment so that the employer is put on notice or a good faith start of Workers' compensation proceedings and; 4) consequent termination." Wallace v. Halliburton Co., 850 P.2d 1056, 1059 (Okla. 1993) (emphasis in original omitted). The district court found that the first three elements had been met, and the hospital does not appear to challenge those findings on appeal. Thus, this appeal centers on Tadlock's claim that the district court erred in concluding that she had not established the fourth element of a prima facie workers' compensation retaliation claim, "consequent termination." The district court concluded that the timing between the hospital's knowledge of Tadlock's workers' compensation action and termination was not sufficient to establish that the termination was retaliatory under Oklahoma law. Indeed, Oklahoma courts have said as much. See Thompson v. Medley Material Handling, Inc., 732 P.2d 461, 464 (Okla. 1987); Wallace, 850 P.2d at 1059 ("[T]iming does not by itself give rise to the level of evidence required to establish a prima facie case.").

In addition to timing, Tadlock also argues that the hospital's "false denials of knowledge" regarding Tadlock's workers' compensation claim "ha[ve] special significance" as circumstantial evidence that the hospital was retaliating against her for filing a claim. The district court rejected that evidence as insufficient to establish "consequent termination" under Oklahoma law, and we agree. The hospital's attorney unsuccessfully argued in his motion for summary judgment that the change in ownership between Integris and Marshall County HMA meant

17

that Marshall County HMA was unaware of Tadlock's claim against Integris despite the fact that the employees of the hospital were essentially the same under both owners. However, nothing in the record indicates that any individual hospital employee denied knowledge of Tadlock's workers' compensation claim. By contrast, the record reflects several points at which employees were asked about paperwork related to Tadlock's workers' compensation claim, and the employees agreed that they had seen it or had knowledge of it. That the district court did not accept the hospital's argument does not indicate that it is evidence of hospital employees denying their knowledge of Tadlock's claim in bad faith.

Tadlock also appears to argue for the first time on appeal that the hospital's "own evidence showed a 'consequent termination' and precluded summary judgment on that issue." Aplt. Br. at 11. Specifically, she points to an email attached as an exhibit to the hospital's summary judgment motion in which the hospital's human resources director stated, "Now that I've had the chance to really digest this information, it appears that Rhonda is trying for whatever sticks at this point." App. at 192. Such a statement suggests that hospital employees believed Tadlock was making bad-faith claims against the hospital and accelerated her "resignation" to counteract them. Moreover, Oklahoma law would appear to consider such statements probative evidence of "consequent termination." Thompson, 732 P.2d at 464 ("He does not even allege that his supervisors or others at any time made any reference regarding termination as a

18

result of bringing the Workers' Compensation action."); <u>Taylor v. Cache Creek Nursing Centers</u>, 891 P.2d 607, 610 (Okla. Ct. App. 1994) ("[P]laintiff has failed to show that her firing was such a consequence. There is no evidence, for example, showing a pattern of termination of workers who filed claims, or of pressure put on workers not to file claims. Plaintiff does not allege her supervisor or other employer representative referred to the claim.").

However, arguments not raised before the district court are waived on appeal. <u>Lyons v. Jefferson Bank & Trust</u>, 994 F.2d 716, 721 (10th Cir. 1993). Although the email in question was attached as an exhibit to both the hospital's summary judgment motion and to Tadlock's response, Tadlock never argued to the district court that it was evidence of "consequent termination" and we will not consider it now. Thus, we affirm the district court's holding that Tadlock did not provide sufficient evidence of "consequent termination" to establish a prima facie case of workers' compensation retaliation under Oklahoma law.

## B. Trial errors

### i. Standards of review

We review the district court's decisions on whether to admit evidence for abuse of discretion. <u>United States v. Davis</u>, 40 F.3d 1069, 1073 (10th Cir. 1994). "A district court abuses its discretion 'when it renders an arbitrary, capricious, whimsical, or manifestly unreasonable judgment.'" <u>Ralston v. Smith & Nephew Richards, Inc.</u>, 275 F.3d 965, 968 (10th Cir. 2001) (quoting <u>Copier v. Smith &</u>

Wesson Corp., 138 F.3d 833, 838 (10th Cir. 1998)).

Regarding Tadlock's arguments about legal error in the jury instructions, "[w]e review a district court's decision on whether to give a specific jury instruction for abuse of discretion, but we review the instructions themselves de novo to determine whether as a whole they state the governing law and provide the jury with a proper understanding of the issues." Gunnell, 152 F.3d at 1259.

"When a party seeks 'reversal of a jury verdict or of a denial of a motion for new trial' by claiming trial errors, it 'must establish the alleged trial errors were both prejudicial and clearly erroneous.'" Baty v. Willamette Indus., Inc., 172 F.3d 1232, 1247 (10th Cir. 1999) (citing Gust v. Jones, 162 F.3d 587, 591 (10th Cir. 1998)). "Evidence admitted in error can only be prejudicial 'if it can be reasonably concluded that with or without such evidence, there would have been a contrary result.'" Sanjuan v. IBP, Inc., 160 F.3d 1291, 1296 (10th Cir. 1998) (internal citations omitted).

*ii. Limiting instruction on workers' compensation evidence*

Tadlock appeals the district court's denial of her requested limiting instruction on the use of workers' compensation evidence, which included that Tadlock had filed a workers' compensation claim and spoke with a workers' compensation lawyer shortly before requesting FMLA paperwork. Tadlock claims that "evidence of workers' compensation was admitted in a way which not only circumvented judicial estoppel but which allowed hearsay and guilt by

20

association evidence as part of the defense theme." Aplt. Br. at 25-27. Tadlock requested a limiting instruction both prior to and during trial. The district court deferred ruling on an instruction before trial, then attempted to word its own limiting instruction before eventually deciding not to give one at all.

First, judicial estoppel does not appear to apply here. We have said, with regard to judicial estoppel: "[w]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position." Johnson v. Lindon City Corp., 405 F.3d 1065, 1069 (10th Cir. 2005) (internal citation omitted). Tadlock argues that the contrary position here is that, once the workers' compensation retaliation claim had been resolved in favor of the hospital, the hospital could not then argue that it terminated Tadlock for making a workers' compensation claim as opposed to an FMLA request.

However, the hospital did not argue at trial that they terminated Tadlock for making a workers' compensation claim. The hospital stated in its opening argument that the evidence would show that Tadlock had actually resigned and was not terminated at all, and that the acceleration of her resignation was based on poor work performance. The workers' compensation claim came up repeatedly in the hospital's cross-examination of Tadlock, though, as well as at other points in the trial. Then, in closing, the hospital argued that it believed Tadlock made up her workers' compensation injury as part of a "plan" to sue the hospital. App.

21

at 1487-94.  However, the hospital did not argue that it accelerated her resignation because of this "plan," but rather because of her behavior in the days after her purported resignation.  The focus on Tadlock's "plan" was aimed at attacking Tadlock's credibility and challenging whether she had a "serious medical condition" under the FMLA.  Thus, the use of this evidence and argument is not "clearly inconsistent" with the hospital's earlier position that it did not terminate Tadlock based on her workers' compensation claim.  Johnson, 405 F.3d at 1069.

Tadlock argues that the district court had an obligation to issue a limiting instruction because the jury could nonetheless have "infer[red] on its own that hostility towards the workers' compensation claim was the real reason for the termination."  Aplt. Br. at 26.  However, the doctrine of judicial estoppel has little to do with what a jury might infer on its own; rather, it is explicitly designed to prevent parties from taking inconsistent positions before a court.  Johnson, 405 F.3d at 1069.  While it is true that Federal Rule of Evidence 105 uses imperative language ("the court, on timely request, must restrict the evidence to its proper scope and instruct the jury accordingly"), Tadlock provides no reason other than the hospital's purported "end-run around judicial estoppel" that a limiting instruction is required.  Aplt. Br. at 26.  Because judicial estoppel does not apply here, a limiting instruction was not necessary.

*iii. Improper hearsay evidence*

Tadlock also argues that the district court allowed improper hearsay evidence from human resources employee Lori Friend, who testified that she had heard rumors about employees in the dietary unit discussing the fabrication of lawsuits against the hospital to garner funds for retirement. The court ruled that Friend could testify on those rumors because it was offered not for the truth of the matter, but to explain why Friend had made a statement in an email that Tadlock was "trying for whatever sticks." App. at 1051-52. While the court could have made a clearer statement to the jury regarding how to consider the evidence, Tadlock did not request a further limiting instruction on this point.[4] Moreover, the testimony on that issue was ultimately very brief in the context of a three-day trial, and thus any error in allowing the testimony or not instructing the jury fully was harmless. See McCue v. State of Kan., Dep't of Human Res., 165 F.3d 784, 791 (10th Cir. 1999).

*iv. Admission of improper character evidence*

Tadlock also challenges the court's admission of evidence about her workers' compensation doctor, Dr. Litchfield, as improper character evidence. In essence, Tadlock seems to argue that by asking whether she knew Litchfield was an anesthesiologist and whether she knew he had once had his license suspended,

---

[4]Tadlock did attempt to make a prejudice objection, but the court overruled the objection without asking for explanation.

the hospital improperly presented evidence that she was litigious and was guilty by her association with Litchfield. Aplt. Br. at 33-34. However, Tadlock entered Litchfield's report into evidence, but did not call him as a witness, essentially making Litchfield a hearsay witness. Federal Rule of Evidence 806 allows a hearsay declarant to be impeached "by any evidence that would be admissible for those purposes if the declarant had testified as a witness." See, e.g., United States v. Burton, 937 F.2d 324, 328 (7th Cir. 1991) ("Rule 806 in effect allows the impeachment of a non-testifying hearsay declarant by the elicitation of statements from a testifying witness."). Thus, it was permissible for the hospital's counsel to examine Tadlock about her doctor's potential bias, interest, and motive, as well as about his general competency to diagnose her back injuries. Moreover, the hospital's questioning is permissible as potential impeachment of Tadlock herself for the same reasons; her lack of knowledge about the doctor who determined her disability status for workers' compensation is at least somewhat probative of her own attitude toward her injury. Where this cross-examination becomes a closer question, however, is in the hospital's inquiry into Litchfield's suspension. Such testimony may be allowable under Rule 608(b) as a prior bad act probative of his character for truthfulness, although it is unclear from the questioning what the basis for his suspension was. Regardless, we cannot say the district court affirmatively abused its discretion by allowing this question.

24

As for Tadlock's "guilt by association" argument, the cases she cites essentially state that such arguments are evaluated under Federal Rules of Evidence 401 and 403 for relevance and prejudice. See, e.g., United States v. Espinoza, 244 F.3d 1234, 1240 (10th Cir. 2001). Although the hospital could have called Litchfield as a witness to cross-examine him about his report rather than question Tadlock about it, we cannot say that it was an abuse of discretion for the judge to allow the questions of Tadlock. Whether Tadlock knew the doctor she saw the week of her FMLA request and workers' compensation claim was qualified to evaluate her back injuries is probative as to her credibility and whether she was "making up" a serious medical condition, and any prejudice to Tadlock in inquiring about Litchfield's credentials was created by her not calling him as a witness. See Shultz v. Rice, 809 F.2d 643, 648 (10th Cir. 1986) (ruling it was proper for judge to allow commentary in closing argument on a plaintiff's failure to call treating doctor to testify because the "choice not to call [the doctor] . . . was highly relevant to the credibility of her testimony, especially where he was available to her").

Thus, we conclude that the probative value of this evidence was not substantially outweighed by its prejudice to Tadlock, and that the district court's decision to admit it was not an abuse of discretion.

*v. Tadlock's "litigiousness"*

Tadlock also argues that the admission of hearsay evidence and character

25

evidence regarding her workers' compensation claims and doctor effectively constituted prejudicial evidence of Tadlock's "litigiousness." Aplt. Br. at 31. However, the case Tadlock cites for the proposition that indirect evidence of litigiousness can be prejudicial enough to require reversal, Richardson v. Missouri Pacific R. Co., 186 F.3d 1273, 1275, 1278 (10th Cir. 1999), involves references to a plaintiff's separate lawsuit against the party 10 years prior to that case. Id. at 1275. By contrast, the testimony that Tadlock visited a workers' compensation lawyer and made a workers' compensation claim in the same week that she had requested FMLA leave is, as the hospital argues, relevant evidence regarding Tadlock's motives and plans, and the hospital has been mostly consistent in its argument that Tadlock was making up the injuries claimed for both workers' compensation and FMLA. The hospital also did not refer to the workers' compensation retaliation claim that was previously a part of the case, although it did reference her seeing a workers' compensation lawyer and his recommended doctor. However, given that Tadlock herself was relying on the workers' compensation doctor's medical assessment for her FMLA claim, it was not an abuse of discretion for the district court to allow the hospital to challenge the validity of that injury and the credibility of the doctor who diagnosed it. Evidence of Tadlock's workers' compensation claim was not admitted to show she was litigious, but rather as probative evidence of her motives and credibility in this case, as well as those of her doctor.

26

*vi. Expert testimony from doctor hired by hospital*

Tadlock alleges that the district court improperly allowed Dr. Allan Fielding to testify at trial when his expert report focused on whether she had qualified for "temporary total disability" based on her work injuries, not whether she had a serious medical condition as required under FMLA. Tadlock objected to Fielding's testimony at trial, and the judge's response after reviewing the expert report was, "I understand your point, but I think that it's relevant when he says that she—due to injuries she now is claiming are part of the basis for her request for FMLA leave that he doesn't find they are significant enough to require leave, so I think it's good cross-examination, but I'll allow it." App. at 1358-59.

Tadlock correctly points to Jacobsen v. Deseret Book Co., 287 F.3d 936, 952-54 (10th Cir. 2002), as one of our lead cases addressing the admission of expert testimony not disclosed in accordance with Federal Rule of Civil Procedure 26(a):

> Although a district court can allow evidence violating Rule 26(a) only if the violation was justified or harmless, . . . the court should consider the following factors: (1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness.

Id. at 953 (internal citation and quotation marks omitted).

Tadlock argues that allowing Fielding to testify beyond the opinions in his report was prejudicial to her because "it was the only evidentiary basis for

27

employer's position that Tadlock did not have a serious medical condition." Aplt. Br. at 37. However, the hospital argues (and noted at trial) that when its expert report was submitted in January 2014, it was still operating under the assumption that Tadlock's claims were based entirely on injuries that occurred at work. By amending her claimed medical conditions to include diabetes and degenerative conditions on summary judgment in February 2014, Tadlock invited this result, and the hospital's actions should not be considered in "bad faith" or "willful."[5] Moreover, Tadlock should not have been surprised that Fielding opined on her medical condition because he had reviewed all of her medical records dating from her fall in 2011 through the end of 2013 and concluded she had "no injur[ies] of permanent nature" due to her falls at work. App. at 1752-53.[6] The hospital also described Fielding's testimony more generally in the pretrial report, stating Fielding would testify "regarding Plaintiff's alleged injuries (or lack thereof)," and Fielding was the hospital's only listed expert witness. App. at 706-09. It is unreasonable for Tadlock to assume that the hospital's proffered medical expert would not opine about whether Tadlock had a "serious medical condition" for the

---

[5]The trial took place less than a month after Tadlock filed her response to the hospital's motion for summary judgment and about two weeks after the district court ruled on the motion. App. at 608, 941.

[6]The hospital argues that it did not seek a legal opinion from Fielding about whether Tadlock had a disability under the ADA or a serious medical condition under FMLA, but that is somewhat belied by the report's references to temporary total disability, which is a workers' compensation term.

28

one claim remaining after summary judgment.  Although it would have been better for the hospital to ask Fielding to supplement his report under Federal Rule of Civil Procedure 26(e), the short time frame between Tadlock's summary judgment response and the trial makes the hospital's failure to do so largely justified.[7]  The district court limited Fielding to testifying about his opinions about Tadlock's condition in February 2012, which was the last date his report provided an opinion on her condition, and the court did not abuse its discretion in allowing such testimony.

### vii. Jury instructions on FMLA claim

Other than proffering her own jury instructions, Tadlock does not appear to have objected to the district court's jury instructions at trial, or at least does not point to where in the record she objected as required by 10th Cir. R. 28(C)(3).  Thus, we review the jury instructions for plain error.  Reed v. Landstar Ligon, Inc., 314 F.3d 447, 453 (10th Cir. 2002).  "We will reverse under the plain error standard only in exceptional circumstances where the error was patently plainly erroneous and prejudicial."  Id. (internal quotation marks omitted).

Regardless of which standard we apply, however, the district court's instructions were not erroneous.  The district court provided four instructions on

---

[7]Federal Rule of Civil Procedure 26(e)(2) indicates that expert reports should be supplemented before the party's pretrial report, but notably, only six days passed between the judge's ruling on summary judgment and the final pretrial report.

Tadlock's FMLA interference claim. The first instruction lists the three traditional elements of the claim, and the three subsequent instructions explain each element in further detail. These instructions essentially paralleled our statement that "[t]o establish an interference claim, [a plaintiff] must show: (1) that [s]he was entitled to FMLA leave, (2) that some adverse action by the employer interfered with h[er] right to take FMLA leave, and (3) that the employer's action was related to the exercise or attempted exercise of h[er] FMLA rights." Campbell v. Gambro Healthcare, Inc., 478 F.3d 1282, 1287 (10th Cir. 2007) (internal citation and quotation marks omitted). Tadlock argues that the district court improperly instructed the jury on the elements of her FMLA claim by failing to modify the first element to "reflect the right to request leave as the entitlement." Aplt. Br. at 40. She also argues that the second element should have referenced her "right to *seek* leave" as opposed to just her right to "take leave." Id. at 41. Lastly, she argues that the instructions should have indicated in the third element that "close timing between the request and termination satisfies" the element of causation. Id.

None of these arguments are persuasive. Tadlock cites Erdman v. Nationwide Ins. Co., 582 F.3d 500, 509 (3d Cir. 2009), for the proposition that "firing an employee for a valid request for FMLA leave may constitute interference with the employee's FMLA rights as well as retaliation against the employee." Id. However, such a proposition has nothing to do with the first

30

element of an interference claim.  Whether an employee is "entitled" to FMLA

protection under the first prong of the test has been interpreted by our circuit as

requiring the employee to demonstrate that she would have qualified for leave

under the act.  DeFreitas v. Horizon Inv. Mgmt. Corp., 577 F.3d 1151, 1159 (10th

Cir. 2009).  While Tadlock raises an interesting argument that the "attempt"

language in the statute would seemingly imply that an employee has the right to

make a good-faith request for leave under the FMLA and not face termination as a

result regardless of whether she was actually entitled to the leave, that does not

square with our caselaw.  Thus, the district court correctly instructed the jury to

determine whether Tadlock was "entitled" to FMLA leave based on a serious

medical condition.  Moreover, the district court included language about

"attempted exercise of [ ] FMLA rights" in the instructions, making it clear that

Tadlock need not have actually taken the leave to make an interference claim.

App. at 901.

In her final jury instruction argument, Tadlock states that the "related to"

language in the third instruction should have been explained in more detail to

indicate that "close timing between the request and termination satisfies that

element."  Aplt. Br. at 41.  As the hospital points out, however, the case cited for

that proposition, Brown v. ScriptPro, LLC, 700 F.3d 1222 (10th Cir. 2012),

merely states that the timing between an FMLA request and a termination "can be

particularly suggestive," and there is no indication that timing is dispositive as to

31

that issue.  Id. at 1227.  Thus, the district court's instructions on the FMLA claim were accurate overall and do not require reversal regardless of whether we apply de novo or plain error review.

*viii. Cumulative effect of any errors*

Tadlock also argues that "[e]ven if the individual errors were harmless . . . the cumulative effect requires reversal."  Aplt. Br. at 38.  "Cumulative-error analysis . . . aggregates all the errors that individually have been found to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless."  Estate of Trentadue ex rel. Aguilar v. United States, 397 F.3d 840, 860 (10th Cir. 2005) (internal citation and quotation marks omitted).  To conduct cumulative error analysis, however, we must have concluded that the district court actually committed errors.  Because we conclude that the district court did not commit any errors of law or abuse its discretion, we need not consider cumulative error.

**III.**

For the reasons set forth above, we REVERSE the district court's grant of summary judgment to Marshall County HMA on Tadlock's ADA claim and REMAND the claim for further proceedings.  We AFFIRM the district court's grant of summary judgment to Marshall County HMA on Tadlock's worker's compensation retaliation claim.  We AFFIRM the jury verdict after concluding

32

the trial court committed no reversible errors or cumulative error.

Entered for the Court


Mary Beck Briscoe
Chief Judge